**PUBLIC UTILITY COMMISSION of TEXAS et al., Petitioners,**

v.

**AT & T COMMUNICATIONS OF THE SOUTHWEST et al., Respondents.**

No. C-6957.

Supreme Court of Texas.

July 12, 1989.

Rehearing Denied Oct. 18, 1989.

Jim Mattox, Atty. Gen., Steven Baron, Asst. Atty, Gen., Austin, for Public Utility Com'n.

Robert J. Hearon, Jr., Pamela Stanton Baron, Austin, for Southwestern Bell.

Marion Taylor, Austin, for Public Utility Council.

John Andrew Martin, Dallas, Don R. Richards, Lubbock, John F. Bell, Jr., Fort Worth, Brook Bennett Brown, Edmond R. McCarthy, Jr., Don R. Butler, Steven A. Porter, Austin, William G. Mundy, Irving, Geoffrey M. Gay, Jon Dee Lawrence, Alfred G. Richter, Jr., Edward L. Eckhart, Austin, Dale H. Johnson, Lubbock, Ward W. Wueste, Jr., San Angelo, for petitioners.

Jim Mattox, Atty. Gen., Lou McCreary, Scott McCullough, Asst. Attys. Gen., Austin, for State Purchasing and General Services Com'n.

Martha Smiley, Carolyn E. Shellman, Katie Bond, R. Steven Davis, II, Joe N. Pratt, Joyce Beasley, J. Alan Holman, Austin, Michael J. Ball, Thomas A Grimaldi, Kansas City, Mo., John M. Kyser, Paul Herrmann, Austin, Ray G. Besing, Dallas, for respondents.

COOK, Justice.

This is an appeal from two administrative determinations by the Public Utility Commission. The district court considered the administrative appeals together and affirmed the commission's orders in both cases. The court of appeals reversed the judgments of the district court, holding that the system of access charges implemented by the commission was unreasonably discriminatory. 735 S.W.2d 866 (1987). We find the rate structure adopted by the commission to be reasonably based on differences between the two types of carriers, with the differences found as facts by the commission supported by substantial evidence in the record. We reverse the judgments of the court of appeals and affirm the judgments of the trial court.

## I.

### A.

This case arises from two related docket cases before the commission. The first case, docket number 5113, was a rate design case that was to be used for future rate change hearings. It was instituted by the commission in April 1983 to assess the effects of the federal court decisions mandating AT & T to divest itself of the local Bell operating companies on the rate structure and telephone utility revenues in Texas.

The basic federal order, which is known as the modification of final judgment or modified final judgment, divided the United States into geographic regions called local access and transport areas (LATAs). The modified final judgment ordered AT & T to divest itself of the Bell operating companies, including Southwestern Bell. The decree further provided that the divested local Bell operating companies could not provide long-distance service between LATAs, *i.e.*, interLATA service; that right was reserved to long-distance companies independent of the Bell operating companies, which are known as interexchange carriers. The Bell operating companies were allowed to provide long distance service within a LATA, *i.e.*, intraLATA service. The interexchange carriers were not specifically allowed to offer intraLATA service; instead, each state could decide whether to allow the interexchange carriers to compete for intraLATA calls.

The second case, docket number 5220, is a rate case filed by Southwestern Bell in which the commission implemented the rate design that it had adopted in docket number 5113. The commission also adopted and incorporated by reference in docket number 5220 the findings of fact and conclusions of law from docket number 5113.

### B.

Texas has a number of local telephone companies other than the Bell operating companies. These companies are referred to as local operating companies. The Bell operating companies and the local operating companies are collectively known as local exchange companies.

Although not parties to the federal divestiture suit, the local operating companies were drastically affected by the modified final judgment because they had been operating under a contractual sharing arrangement[1] with respect to revenues from long-distance calls that originated or terminated within the state. Under this arrangement the local operating companies shared in the revenue generated by long distance service. Under the modified final judgment, however, the local exchange companies lost the pool of long-distance revenue they would have received under this arrangement.

This revenue loss had to be recouped from some other source for the local operating companies to remain profitable. The commission allowed the interexchange carriers to participate in the proceeding to determine how to recoup this revenue loss.

The interplay between the federal orders and the state's exclusive regulatory domain focused the dispute largely on the allocation of non-traffic sensitive costs. Non-traffic sensitive costs are those associated with the local exchange company's telephone plant that do not increase as traffic or usage increases, such as cables, poles, and telephone instruments.

The interexchange carriers advocated allocating the non-traffic sensitive costs on the end users of local exchange services. Under this proposal a very significant portion of the non-traffic sensitive costs of the

1. This arrangement is called the toll-pool agreement, and the allocation of pooled toll revenues between Southwestern Bell, both pre- and post-

divestiture, and the local operating companies is called the settlements process.

local exchange companies would have been recovered as some form of end user charge, which would have been reflected in increased rates for basic telephone service. The commission rejected this proposed rate structure.

The local exchange companies advocated recouping non-traffic sensitive costs by imposing charges on the interexchange carriers for their use of the network owned by the local exchange companies. The local exchange companies argued that the interexchange carriers should contribute to defraying the costs of the local exchange network since they use it to complete virtually all of the calls they carry.[2] The charge under this proposed rate structure is called an interexchange carrier access charge. The commission adopted a modified form of the interexchange carrier access charge as its rate structure in docket number 5113.

The commission determined that the interexchange carrier access charge should apply to all intrastate toll calls whether the calls were intraLATA or interLATA. By definition, the charge applies only to interexchange carriers. The commission based its determination to apply the access charge to all calls in part on the finding that local exchange companies cannot determine whether a call is intraLATA or interLATA. Thus, all calls will be considered interLATA, to which access charges apply, even though the call might be wholly intraLATA. As a result, the interexchange carriers would pay an access charge on intraLATA long distance calls whereas the local exchange companies would not.

The commission left the existing rate structure for the local exchange companies largely intact. In particular, the commission did not require the local exchange companies to impute an access charge on themselves for the intraLATA long-distance service they provide. In a concession to the interexchange carriers' arguments that the proposed order would make them

bear too much of the local exchange companies' non-traffic sensitive costs, the commission ordered a ten percent increase in the intraLATA long-distance rates for the local exchange companies.

## II.

### A.

The court of appeals' opinion is based on its observation that for certain intraLATA long-distance calls, especially ones for shorter distances, the access charge paid by the interexchange carriers exceeds the entire rate charged by the local exchange companies. 735 S.W.2d at 869. The court of appeals concluded that the net effect is that a customer must pay more for an intraLATA long-distance call placed through an interexchange carrier than for one placed through a local exchange company, thus placing the interexchange carriers at a competitive disadvantage with the local exchange companies. *Id.*

Virtually all of the respondents concede that the court of appeals' factual conclusion that a customer must pay more for an intraLATA long-distance call placed through an interexchange carrier than for one placed through a local exchange company is not only a fact not found by the commission, but is factually incorrect. The reviewing appellate court is not to make independent findings of fact; the right to find facts rests with the administrative agency. *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 286 (Tex.1977). The court is not to substitute its judgment for that of the administrative body. *Id.*

Further, the conclusion that the interexchange carriers are placed at a competitive disadvantage because of the rate design adopted by the commission is a finding the commission expressly declined to make. The hearing examiner's report in both cases expressly stated that the interex-

---

**2.** The commission found that the present structure gives an unreasonable preference to the interexchange carriers other than AT & T, which are known as other common carriers; the commission likewise found that the present struc- ture unreasonably prejudices AT & T. This is because the other common carriers made no contribution to the non-traffic sensitive costs of the local exchange companies while AT & T did make such contributions.

change carriers failed to prove that the proposed access charge system placed them at a competitive disadvantage, and the commission adopted these findings. The hearing examiner's report further states that it would be inequitable, in the absence of proof establishing competitive disadvantage, to impute intraLATA toll related non-traffic sensitive costs on local exchange customers when these customers are already paying their fair share of the costs.[3]

The reviewing court, in determining whether the administrative agency has adequately articulated its findings of fact and conclusions of law, is to give appropriate consideration to such statements in the reports that were adopted by the commission in its final order. *See State Banking Board v. Allied Bank Marble Falls*, 748 S.W.2d 447, 448–49 (Tex.1988). Thus, the court of appeals made findings that the commission expressly refused to make, thereby invading the fact finding authority of the commission.

### B.

This court has previously set forth the authority of the commission to design rates based on the concepts of universal service, residual pricing, and value of service. *See Texas Alarm & Signal Ass'n v. Public Util. Comm'n*, 603 S.W.2d 766, 770 (Tex.1980). As long as the commission addresses the rate considerations set by Public Utility Regulatory Act, the particular factors and the weight to be given those factors are within the discretion of the commission. *Id.* at 772–73. The commission may establish classes of customers and set rates for such classes that are literally discriminatory if the rates are not unreasonably discriminatory as to that class of customers. *Id.* at 772.

The commission designated the interexchange carriers as a distinct class of customers separate from the other classes of customers of the local exchange companies. The commission found facts to support this conclusion and expressly found the proposed treatment of the interexchange carriers through the interexchange carrier access charge rate design was not unreasonably discriminatory.

### C.

The respondents argue that all carriers of intraLATA long-distance calls should also have to pay the access charge. Thus, the interexchange carriers contend that the local exchange companies should have to impose an access charge on themselves for intraLATA calls. Since an interexchange carrier is a customer of the local exchange company, this concept assumes that the local exchange company, as to its own intraLATA long-distance rates, is a customer of itself. The findings of the commission do not support imputing an access charge on the local exchange companies or treating the local exchange companies as customers of themselves. The commission specifically found that the use interexchange carriers make of the local exchange companies' networks is fundamentally different than the use made by other business customers of the local exchange companies: the interexchange carriers use the local exchange network to originate and terminate interexchange telecommunications traffic.

Even if the local exchange companies were considered to be their own customers, there is still a basis for treating them as a different class of customers from the interexchange carriers.[4] The commission found several differences between the local exchange companies and the interexchange

3. The commission found that local flat rates on average already recovered over half of the non-traffic sensitive costs of the local exchange companies.

4. The court of appeals seized on a finding by the commission that the use the interexchange carriers make of the local exchange network is functionally identical to the use made by the local exchange companies. When read in con-

text, however, it is seen that this was part of a group of findings made by the commission to support imposition of the interexchange carrier access charge because of past rate discrimination, *see supra* note 2. This finding does not support the conclusion that the interexchange carriers and local exchange companies are not two distinct classes of customers.

carriers, including the following: the other common carriers are not regulated by the commission, can select the markets in which they wish to do business and can enter or leave such markets at will, and can set their own rates and change them at will.

### D.

The interexchange access carriers also argue that the commission had to adopt a completely nondiscriminatory rate structure in order to comply with sections 45 and 47 of the Public Utility Regulatory Act (PURA), Tex.Rev.Civ.Stat.Ann. art. 1446c (Vernon Supp.1989). Both of these sections, by their very terms, apply to only the public utility itself and not the commission. Section 38 of the PURA is the section that provides guidance to the commission in designing a rate structure. *Texas Alarm & Signal,* 603 S.W.2d at 772.

### III.

Accordingly, we reverse the judgments of the court of appeals and affirm the judgments of the trial court, which affirmed the commission orders in docket numbers 5113 and 5220.

MAUZY, J., files a concurring opinion in which SPEARS, GONZALEZ and DOGGETT, JJ., join.

MAUZY, Justice, concurring.

I fully agree with the court's opinion and judgment in this case. Because the court's opinion neither clearly states the extent of the PUC findings nor addresses several important alternative grounds for affirming the trial court's judgment upholding the PUC orders, I write this concurring opinion to address those issues.

### PROCEDURAL BACKGROUND AND TERMINOLOGY

This whole controversy began when PUC had to assess the effects of the federal court decisions mandating the divestiture of the AT & T–Bell network under the federal anti-trust laws on the rate structure and telephone utility revenues in the State of Texas. The whole rate design case was, to some extent, an "emergency" proceeding because something had to be done before the federal orders took effect.

The "Modification of Final Judgment" ("MFJ") ordered that AT & T had to divest itself of its Bell Operating Company subsidiaries, of which Southwestern Bell was one. The decree further provided that the local Bell operating companies (after divestiture) could not provide long distance service between LATAs ("interLATA"). That right was reserved to long distance companies independent of the Bell operating companies, such as AT & T (after divestiture), MCI, and GTE Sprint. (The long-distance companies are also referred to as "Interexchange Carriers," "IXCs" or "IECs").

The local Bell companies were not prohibited from providing long distance service within a LATA ("intraLATA"). The long distance carriers were not specifically allowed to offer intraLATA service. Each State could, accordingly, decide whether to allow AT & T and the independent long-distance carriers to compete for intraLATA calls. The PUC could theoretically have prohibited the IXCs from competing for intraLATA toll call business at all.

The State of Texas, like many other Western states with some significant sparsely populated areas, has a number of local telephone companies other than Bell operating companies. These companies are subject to regulation by the PUC but were not parties to the federal divestiture suit. The non-Bell local operating companies ("LOCs") were not subject to the federal judgment, and presumably could compete interLATA if they chose to do so. (The PUC found as a fact that their technological configurations precluded them from providing interLATA services, as a practical matter.) The Bell operating companies ("BOCs") and non-Bell local operating companies together comprise the Local Exchange Companies ("LECs").

Even though not parties to the suit, the local operating companies were drastically affected by the federal order because they were operating under a pre-divestiture PUC-approved contractual sharing arrange-

ment with respect to revenues from long-distance calls that originated or terminated within the state. The arrangement is referred to as the "toll-pool" agreement, and the allocation of pooled toll revenues between Southwestern Bell (pre- and post-divestiture) and the independent local telephone companies is called the "settlements" process. The settlements process in effect allowed the local operating companies to share in the revenue generated by long distance service, to offset their expense in maintaining the local exchange operations.

The MFJ impacted all local operating companies in the State of Texas. The MFJ in effect destroyed the rate design and rate structure adopted by the PUC, and under which the LECs operated. The LECs lost the pool of all the long-distance revenue that would have been generated by AT & T and allocated to them through the settlements process. The revenue loss had to be recouped from some other source for the local exchange companies to be able to survive. The PUC allowed the interexchange companies—AT & T and the other long-distance carriers—to participate in the proceding to decide how to recoup the revenue loss. (The other long-distance carriers—other than AT & T—are also known as Other Common Carriers or "OCCs".) The interplay between the federal orders and the state's exclusive regulatory domain focused the dispute largely on the allocation of "Non–Traffic Sensitive" ("NTS") costs.

The Non–Traffic Sensitive (NTS) costs are those associated with the local exchange company's telephone plant for which costs do not increase as traffic or usage increases. Examples of NTS plant are outside plant (cables and poles), terminals and station equipment (telephone instruments), drop line to each customer's premises, and the cable pair (local loop) between the customers and a local exchange central office.

The IXCs advocated allocating the NTS costs on the end users of local exchange services. Under this proposal a very significant portion of the NTS costs of the LECs would have been recovered as some form of end user charge, which would have been reflected in increased rates for basic telephone service. Put simply, the IXCs argued that local rates should have been increased. The Findings of Fact and Conclusions of Law adopted by the PUC in Docket No. 5113 show that the Commission clearly rejected this proposed rate structure. The LECs advocated recouping NTS costs by imposing charges on the interexchange carriers for their use of the network owned by the LECs. The LECs urged that the interexchange carriers use the local exchange network to complete virtually all of the calls they carry, and thus should contribute to the costs associated with the network that was essential to their existence. The acronym associated with this proposed rate structure is "ICAC," for "interexchange carrier access charge." The PUC adopted a modified form of ICAC as its rate structure in Docket No. 5113. That rate design was to be used as each individual LEC came before the PUC for a rate change (increase) hearing.

As stated above, the federal orders did not guarantee the OCCs or AT & T the right to provide intraLATA long distance service at all; presumably each state's telephone utility regulatory body had the right to reserve all intraLATA intrastate long distance business to the local exchange companies. The PUC determined it would allow OCCs to offer intraLATA long-distance services. (Equivalently, the PUC required the LECs to provide access to OCCs for intraLATA toll calls.) The PUC set the access charge for IXC access for an intraLATA long-distance call by the same mechanism as for interLATA access: a charge for access to the local exchange without differentiation based on whether the toll call is intraLATA or interLATA. The PUC based this decision in part on a practical fact finding: Since local exchange companies cannot determine the intraLATA/interLATA nature of OCC traffic (because of the line-side connection), all OCC traffic will be considered interLATA, to which access charges apply, even though the serviced call might be wholly intra-

LATA. (Restated Finding of Fact No. 218).

The PUC largely left the existing rate structure for the local exchange companies intact. In particular, the PUC did not require the local exchange companies to go to an "access charge" structure and "impute" an access charge to themselves for the intraLATA long distance service they themselves provided to their customers. The hearings examiner recommended that the portion of the local company's bill for long-distance and the charges for local (intraLATA) long-distance service not be increased to recover NTS costs. In a limited concession to the IXCs' arguments that the proposed order would make them bear too much of the LEC NTS cost, the Commission ordered that intraLATA long distance rates for the LECs increase ten percent. Consistent with its decision to increase the LEC toll call costs by 10%, the PUC modified a number of the findings and conclusions by the hearings examiner. The findings and conclusions of the Commission are collected as the Restated Findings of Fact and Conclusions of Law attached to the Final Order.

Southwestern Bell Telephone Company actually had a rate case pending before the PUC. It was the second case from which appeal was taken in this case—PUC Docket No. 5220. In this Bell rate case the PUC for the first time actually implemented the rate design it had adopted in Docket No. 5113. Virtually every party in PUC Docket No. 5220 had also been a party to PUC Docket No. 5113. The Commission adopted and incorporated by reference in Docket No. 5220 all its findings, conclusions, and proceedings from Docket No. 5113.

The significance of the rate design issue is reflected by the numbers in this Bell rate case. In PUC Docket No. 5220, Southwestern Bell (SWB) sought a rate increase of approximately $1.5 billion, primarily because of lost revenues from the divestiture order. The PUC determined that the revenue requirement was approximately $880 million, and implemented the revenue increase according to the rate design it had adopted in Docket No. 5113.

## THE SETTLEMENTS PROCESS AND PUC FACT FINDINGS

### a. *Settlements Process Revisited*

Intrastate toll rates, for the LECs, are set by the PUC. The Public Utility Regulatory Act ("PURA") provides that long-distance rates are to be set on a state-wide basis. See Tex.Rev.Civ.Stat.Ann. art. 1446c, sec. 18(c)(6) (Vernon 1987). Thus, for example, a toll-call of 26 miles costs the same whether it is from Austin to Georgetown (an urban area for which per capita NTS costs are relatively low), or from one West Texas community to another (where the sparse settlement makes the line costs and other NTS items relatively high, per capita). But under the settlements process as it existed before divestiture, the same was not true for the way the generated long distance revenue was divided. The rural LECs with relatively greater need for NTS cost recovery from long distance revenues received proportionately more from the long-distance revenue "pie." The purpose of this PUC-approved rate design was to further universal service, as discussed below. The substitution of an access charge system, even if only for interLATA calls, would represent a substantial reduction in the toll revenue dedicated to supporting NTS costs of the small rural operating companies.

A large number of the Findings of Fact and Conclusions of Law in the rate design proceedings were obviously made to support the PUC's conclusion that the pooling and settlements process, at least to intraLATA toll calls to the extent it could remain unchanged after divestiture, should remain unchanged to protect these small independent telephone companies and the customers they serve. For example, included in the Restated Findings of Fact and Conclusions of Law in Docket No. 5113 are the following (numbered as in original):

212. The primary objective of a pooling and settlements process is the promotion of uniform tariffed statewide rates to customers for services provided by more than one exchange company.

213. The result of uniform tariffed rates is that regardless of the originating location of a call, the same distance- and time-sensitive rate applies.

\* \* \* \* \* \*

216. Without a pooling and settlements process, it is possible that all other things being equal (time of day, duration, etc.), the direction of a call completed over the facilities of more than one exchange company would determine its cost and therefore the rate.

217. The pooling and settlements compensation mechanism assures customer understanding and eliminates the incentive for "code calling," by which customers signal each other in order to achieve the lowest rate on toll calls.

218. Since local exchange companies cannot determine the intraLATA/interLATA nature of OCC traffic (because of the line-side connection), all OCC traffic will be considered interLATA, to which access charges apply, even though it may be wholly intraLATA.

219. All intrastate intraLATA toll NTS costs should not be assigned to intrastate interLATA access. The portion of intrastate intraLATA toll NTS costs of local exchange companies currently being recovered from intraLATA toll pool should remain at the same level as under the interim order in this docket.

220. Local flat rates on the average already recover more than half the NTS costs of the local exchange companies.

221. The operations and revenues of the Independents have been directly affected by AT & T's divestiture of SWB: high cost, low density companies are affected most by the disruption in the toll revenue stream caused by divestiture.

222. Nothing in the record in this docket supports the contention that local exchange rates for the small telephone companies which have never filed rate cases before this Commission should have increased.

223. Texas telephone companies have some of the greatest extremes of operating costs and densities as exist anywhere in the nation.

224. Termination of intraLATA toll pooling and settlements could result in unforeseen negative consequences, such as causing some smaller telephone companies to go out of business; therefore such termination should not be undertaken without further investigation.

225. Rather than risk the loss of any local exchange company, intraLATA toll pooling and settlements should continue through 1984 and 1985 while the investigation proceeds.

226. Only a few local exchange companies have any OCC interconnections.

227. Any increase in intrastate toll rates to recover NTS costs (rather than an increase in local flat rates) has worked to the advantage of the OCCs, since their enterprises are based on their ability to underprice the end-to-end toll services of the traditional toll partnership.

\* \* \* \* \* \*

229. Implementing an access charge structure at parity, with some modifications, is equitable to all interexchange carriers and causes the least disruption to the operations of the local exchange companies and to the high level of universal service in Texas.

230. Implementing an access charge structure as recommended herein has the advantage of being available relatively quickly because it uses parity rates for recovery of traffic sensitive costs and for some nontraffic sensitive costs.

\* \* \* \* \* \*

232. Under the present pricing scheme, interexchange carriers contribute to NTS cost recovery at widely varying levels.

233. Implementing a parity access charge structure, with some modifications, will require all interexchange carriers to contribute equitably to NTS cost recovery.

(Conclusions of Law, Restated, as numbered in original):

19. Even if subscribing to local exchange service is the direct cause of the NTS costs of local exchange companies, the assignment of all NTS costs to end

users on the basis of economic efficiency is not necessarily in the public interest.

20. Regulatory authorities are concerned with more than the promotion of economic efficiency in designing rates; they must also consider valid social, political and ethical goals.

21. Universal telephone service in Texas remains a valid ratemaking principle of this Commission under PURA; residual pricing of local service and value of service pricing are two methods of promoting and preserving universal service.

22. Because implementation of end user access charges presents a threat to universal service in Texas, such charges are not in the public interest.

23. This Commission cannot control whether the · FCC will implement end user access charges as a mechanism for recovering interstate toll related costs; however, in carrying out its statutory mandate to protect and promote the public interest in having adequate and efficient telecommunications service available to all citizens of the state at just, fair and reasonable rates, this Commission must consider the effect on universal service of both interstate end user access charges and mirrored intrastate end user access charges.

24. The use interexchange carriers make of the local exchange network is fundamentally different from the use made by other business customers, as set forth in Findings of Fact Nos. 153, 157 and 158; therefore, it is reasonable to establish interexchange carriers as a distinct class of customers pursuant to PURA Section 37.

25. Because of the way in which interexchange carriers utilize the local exchange network and because the value of the local exchange network to interexchange carriers is substantial, as set forth in Findings of Fact Nos. 149 through 165 inclusive, it does not violate PURA Section 38 to require all interexchange carriers to contribute to the NTS costs of local exchange companies in excess of the costs interexchange carriers themselves impose under a value of service pricing concept, so long as such contribution is equitable as among the members of the interexchange carrier class.

26. It is not unreasonably discriminatory, unjust or unfair to require all interexchange carriers to share equitably the NTS costs of the local network.

27. The present NTS cost recovery structure in Texas is in violation of PURA Sections 38 and 45 because within the class of interexchange carriers, OCCs receive an unreasonable preference and AT & T is unreasonably prejudiced in that OCCs do not contribute to any NTS costs other than their own and AT & T does so contribute.

28. The present NTS cost recovery structure in Texas results in interexchange carriers paying different rates for similar or identical use of local exchange plant and facilities in violation of Sections 38 and 45.

29. The Commission is not required to preserve competition at the risk of sacrificing universal service; instead the Commission must balance the goals of the PURA in achieving a reasonable—not a perfect—resolution of the issues in this docket.

30. The preservation and promotion of universal service remains the paramount policy consideration of the Commission.

The respondents in this court, in the face of these findings and conclusions, maintained that the rate design they advocate of imputing access charges to the LECs for the use by the LECs of their own plant for intraLATA long distance service is mandated by PURA and would not affect universal service.

Respondents admitted that the findings and conclusions of the Commission are supported by substantial evidence, but nevertheless urged the findings were not "material" because the differences did not relate to "competition" between the interexchange carriers and the LECs for intraLATA toll business. The IXCs in effect argue that the PUC had to look at the "local" picture of competition between the IXCs and the LECs for intraLATA toll customers, and disregard the broader ques-

tion of what the rate design would do to telephone service throughout the state. This is wrong. The PUC in the area of rate design properly is to look at the whole forest, not just the trees.

b. *Court of Appeals' Reasoning and Factual Assumptions Flawed*

The court of appeals' opinion is based on its observation that "for certain intra-LATA long distance calls, particularly those made over shorter distances, the entire basic rate charged by the local exchange carriers and SWB is less than the access charge paid by AT & T and the OCCs, not computing in other costs that AT & T and the OCCs must reflect in their long distance charges." 735 S.W.2d at 869. From this observation the court of appeals concluded that "[t]he net effect is that a customer must pay more for an intra-LATA long distance call placed through AT & T or an OCC than for one placed through a local exchange carrier or SWB. This fact, of course, places AT & T and the OCCs at a competitive disadvantage with the local exchange carriers and SWB." *Id.*

The court's opinion correctly holds the court of appeals erred because a reviewing appellate court is not to make independent findings of fact; the right to find facts rests with the administrative agency. *Imperial American Resources Fund, Inc. v. Railroad Commission*, 557 S.W.2d 280, 286 (Tex.1977). The court of appeals is not to substitute its judgment for that of the administrative body. *Id.*

Virtually all respondents in this court concede that the court of appeals' factual conclusion that "a customer must pay more for an intra-LATA long distance call placed through AT & T or an OCC than for one placed through a local exchange carrier or SWB" is not only not a fact found by the PUC but is factually incorrect in all cases. The OCC's always undercut the LEC rates.

The conclusion that the OCCs and AT & T are placed at a competitive disadvantage because of the rate design adopted by the Commission is a finding the Commission expressly declined to make. It is instructive to examine the language adopted by the PUC. The hearing examiner's reports (in portions adopted by the PUC) in both Docket Nos. 5113 and 5220 expressly stated that the interexchange carriers failed to prove that the proposed access charge system placed them at a competitive disadvantage. The hearing examiner's reports further state that it would be inequitable, in the absence of proof establishing competitive disadvantage,

> to impose intra-LATA toll related NTS costs on. ... local exchange customers through higher exchange rates or higher short-haul toll rates when the record shows that these customers are already paying their fair share of the costs.

The hearing examiner reports further stated that a "complete discontinuation of pooling and settlements could be a death blow for some of [the] smaller companies." The court's opinion correctly holds that the reviewing court is to give appropriate consideration to such statements in the reports which were adopted by the Commission in its Final Order, in determining whether the administrative agency has adequately articulated its findings and conclusions. *State Banking Board v. Allied Bank Marble Falls*, 748 S.W.2d 447, 449 (Tex.1988). The court of appeals made findings the PUC expressly refused to make. It invaded the fact finding authority of the PUC and substituted its discretion for that of the agency. Its decision cannot stand for those reasons alone.

c. *Factual Distinctions and PUC Discretion in Rate Design*

This court properly grounds its decision on the authority of the PUC to design rates based on the concepts of universal service, residual pricing, and value of service. The explanation of the relationships among those concepts bears repeating here:

> Basically, the universal service objective is founded on the concept that all subscribers to a telephone company's basic service network benefit when another person joins that network. Therefore, the entire network is more valuable because of the addition of the new subscriber. This universal service objective is achieved by residual pricing. Once an

overall revenue increase is approved for the telephone utility, the revenue requirement will be distributed among the various services in a rate structure. Each service will absorb a part of the revenue increase; however, to insure that many persons will use the basic service, the rates for basic service are kept lower. This is accomplished by distributing as much of the revenue increase as possible to nonbasic services before increasing the rates for basic service. Therefore, the basic rates are increased only by the residual amount. The value of service principle determines where a majority of a revenue increase is distributed in the rate structure. Those services that have the most inelastic demand (least sensitive to price changes) will absorb most of the revenue increase. Therefore, the consumers who place a higher value on telephone service will absorb more of the increase. Because these inelastic demand services absorb most of the revenue increase, the basic services can remain at a lower price thus furthering the universal service objective.

*Texas Alarm & Signal Ass'n v. Public Utility Commission,* 603 S.W.2d 766, 770 (Tex.1980).

The Commission addressed the rate considerations set by PURA. The particular factors and the weight to be given those factors are within the discretion of the PUC. *Id.* at 772–73 & 772n.8. The PUC may establish classes of *customers* and set rates for such classes that are literally discriminatory if the rates are not unreasonably discriminatory as to that class of customers. *Id.* at 773.

The PUC has found the rate design it adopted necessary and proper to protect its universal service objective under its residual pricing policy. The court of appeals accepted an argument that the PUC had to require the LECs to "impute" an access charge to themselves for use of their own equipment in providing intraLATA long distance services to "end user" consumers. Implicitly the court of appeals must have found some statutory policy that overrode the PUC's express findings. That whole analysis by the court of appeals is serious error.

To establish the IXCs as a separate class of customers, the PUC had to find facts justifying separate treatment of the IXCs as a class of *customers* distinct from the other *customers* of the LECs. The PUC found such facts and expressly found the proposed treatment of the IXCs through the ICAC rate design was not unreasonably discriminatory. The LECs are not "customers" of themselves. The concept of "imputing" an access charge to the LECs themselves assumes, as a matter of statutory construction, that the local exchange company, as to its own intraLATA long distance rates, must be a "customer" of itself. There is nothing in the PURA to justify such a conclusion. Section 38 of PURA provides, "Rates shall not be unreasonably preferential, prejudicial, or discriminatory, but shall be sufficient, equitable, and consistent in application to each *class of consumers*" (emphasis supplied). The rates LECs charge their customers for short-haul long distance service are set by the PUC as rates to those direct consumer customers. This construction is basic to the whole "rate design" concept, as set forth in *Texas Alarm & Signal.* The rates for other business customers, including those such as the IXCs who buy the services (of access) to compete in part for *some* of the intraLATA long distance business, is set by the PUC as a charge of the LEC to the IXC as a "customer" of the LEC's services. The PUC has broad discretion to set classes of "consumers" for rate design purposes. Section 18(a) of PURA provides that the PUC is "to provide equal opportunity to all telecommunications utilities in a competitive marketplace," but also states that telecommunications enterprises constitute "a competitive industry which does not lend itself to traditional public regulatory rules, policies, and principles" and grants the PUC broad discretion to formulate and apply "new rules, policies and principles ... to protect the public interest" and provide equal opportunity.

In an effort to find a PUC fact-finding justifying the concept of "imputing" access

charges and treating LECs as customers of themselves, the IXCs point to, and the court of appeals made reference to, a supposed fact finding "that use of local exchange carriers and SWB in making intraLATA long distance calls is functionally identical to the use of the same by AT & T and the OCCs." 735 S.W.2d at 869. The IXCs cite to Restated Finding of Fact No. 172 in PUC Docket No. 5113, which states:

> 172. OCC rates do not include the same contribution to NTS costs as the toll rates of AT & T, SWB and the Independents, even though their use of local exchange plant and facilities is functionally identical.

The preceding Finding of Fact was that

> [u]nder the present pricing scheme, each time subscribers place calls over OCC facilities, they avoid paying the NTS cost support built into the toll rates for AT & T/SWB/Independents that customers without a choice of interexchange carriers must pay.

Finding of Fact No. 172 was part of a cluster of findings that addressed the pre-divestiture rate design under which the OCCs avoided paying anything to support local exchange companies' NTS costs. It was part of the cluster of findings by the PUC to support imposition of the ICAC access charge rate design on the OCCs in part because of past rate discrimination in favor of the OCCs. The finding is not a justification for treating the LECs as "consumers" or "customers" of themselves, nor for "imputing" an access charge to them.

Even if the PUC and this court had to consider the LECs as their own "customers" for purposes of competition for intraLATA toll calls, the facts expressly found by the PUC as distinctions between the LECs and the IXCs are sufficient to justify the treatment given by the PUC rate design. From PUC Docket No. 5113, Restated Findings of Fact and Conclusions of Law, these distinctions include (numbered as in the order):

> 45. Other Common Carriers (OCCs) provide intrastate toll services in some markets in Texas.

> 46. OCCs' intrastate operations are not regulated by the State of Texas.

> 47. OCCs can select the markets where they wish to serve and can enter or leave such markets at will.

> 48. OCCs may set their own rates within Texas and change them at will.

> 49. OCCs do not own their own local exchange networks.

> 50. OCCs interconnect with local exchange companies which provide the equipment and facilities for OCC customers to originate and terminate interexchange calls; thus, OCCs are customers of the local exchange companies.

> 51. SWB provides interconnections to OCCs pursuant to its "Facilities for OCCs" tariff.

> 52. Independent companies with OCC interconnections provide them pursuant to contracts.

> \*   \*   \*   \*   \*   \*

> 84. The MFJ required the BOCs to establish geographic exchange areas, termed Local Access and Transport Area (LATAs), to define the areas within which BOCs may provide telecommunications services and between which BOCs may not provide such services.

> \*   \*   \*   \*   \*   \*

> 88. Under the MFJ, the BOCs may not provide interexchange (interLATA) telecommunications services or information services, manufacture telecommunications products or customer premises equipment, or provide any other product or service (except exchange telecommunications and exchange access service) that is not a natural monopoly service actually regulated by tariff.

> \*   \*   \*   \*   \*   \*

> 97. The joint provision of toll service between the Independents and SWB in Texas will be restricted to intraLATA toll services.

> 98. The SWB toll tariffs for Texas in which all Texas exchange companies concurred will not be effective after divestiture.

> 99. The settlement agreements providing for the division of interLATA toll

revenues will not be valid after divestiture.

\* \* \* \* \* \*

101. AT & T does not presently provide intrastate intraLATA service but could do so if it ordered lineside connections from the local exchange companies.

\* \* \* \* \* \*

103. The LATA boundaries do not affect where OCCs may carry toll traffic or provide telecommunications services.

\* \* \* \* \* \*

152. Interexchange carriers are customers of the local exchange companies.

153. Interexchange carriers need and use the local exchange network to originate and terminate the interexchange traffic they carry.

154. Without the local exchange network already in place, competition in the interexchange markets would not exist.

155. The cost of duplicating the local exchange network is inestimable.

156. The value derived by interexchange carriers from the presence of the local exchange network is nothing less than their ability to exist at all.

157. The use which interexchange carriers make of the local exchange network is fundamentally different from the use made by other business customers such as department stores, because interexchange carriers—unlike department stores—use the local exchange plant to originate and terminate interexchange telecommunications traffic.

158. Interexchange carriers use local exchange plant in offering the end-to-end toll services on which they made a profit; therefore, the value they derive from such use is substantial.

159. The value of the local exchange network to interexchange carriers is not only more than zero, it is more than the costs those carriers impose by virtue of their own interconnections.

160. Access is a two-way street: not only do subscribers have access to the interexchange carriers' network, the interexchange carriers have access to the subscribers.

161. It is not unreasonably discriminatory, unjust or unfair to require all interexchange carriers to share the NTS costs of the local exchange plant to which they have access, which they use to offer and sell their own services and for which many presently pay nothing above their own NTS costs.

162. Interexchange carriers benefit directly from the high rate of subscription to local service fostered by the ratemaking principles employed by this Commission, since that has created a large pool of potention customers for interexchange carriers' services.

\* \* \* \* \* \*

166. Under the present NTS cost recovery structure in Texas, toll rates for AT & T and for the local exchange companies recover part of the total NTS costs of local exchange companies; the rates paid by OCCs recover the NTS costs of only their own interconnections.

167. The present NTS cost recovery structure in Texas results in interexchange carriers paying different rates for similar or identical use of local exchange plant and facilities.

168. The record in this case does not support the contention that the present price differential between OCCs and the traditional toll partnership must be maintained until equal access is available in order to preserve and protect competition in the toll markets.

169. Competition will benefit only those Texans residing in high-density, high-traffic areas who make enough toll calls each month to justify the monthly subscription price most OCCs charge.

170. Texas customers who do not reside in high-density, high-traffic areas or who do not make enough toll calls each month to recoup the subscription fee will not benefit from competition in the interexchange markets.

171. Under the present pricing scheme, each time subscribers place calls over OCC facilities, they avoid paying the NTS cost support built into the toll rates for AT & T/SWB/Independents that cus-

tomers without a choice of interexchange carriers must pay.

\* \* \* \* \* \*

218. Since local exchange companies cannot determine the intraLATA/interLATA nature of OCC traffic (because of the line-side connection), all OCC traffic will be considered interLATA, to which access charges apply, even though it may be wholly intraLATA.

\* \* \* \* \* \*

[Also findings 220–229, and conclusions of law 14–17 and 24–25, portions of which already are recited above.].

Respondents argue, and the court of appeals apparently agreed, that these distinctions as found by the PUC are not "material." The court of appeals' holding would require that the access charge to the IXCs guarantee them a profit on every single intraLATA call. This further illustrates the error in considering the facts relied upon by the IXCs, which were not found by the Commission. Respondents in a joint post-submission brief assert that "the record in this case shows that the Commission's orders result in NTS cost recovery of $0.0216 per LEC intraLATA toll minute versus $0.0792 per IXC intraLATA toll minute." In a footnote respondents state the source for such figures is one number taken from Southwestern Bell's application for writ of error divided by another number taken from an AT & T trial exhibit introduced at the Commission hearing. The PUC found no such fact, and was not required to believe either exhibit in finding facts. Also, the impossibility of making the LECs be their own "customers" is illustrated by a postsubmission brief by AT & T. In arguing that the access charges imposed on the IXCs was unreasonably discriminatory, AT & T uses for comparison not any figures for NTS cost recovery by the LECs (i.e., their rates for their services, and then allocation of such to NTS costs), but comparison with what other business customers must pay "for one 314B circuit [line-side connection]." The "facts" relied upon by respondents are not facts because they were not found by the Commission, and they involve comparisons, ratios and calculations the validity of which the Commission would have had to pass upon.

With the caveat that we are not dealing with "facts," even if the assertions of respondents are taken as true, the express findings of the PUC adequately support its access charge rate structure. Taking a chart showing the alleged "unreasonable discrimination" from another joint post-submission brief by respondents, we consider this chart:

| Distance of Call (Miles) | Local Companies IntraLATA Long Distance Rates | | Total Access Charges Paid by IXCs (Per Minute) |
| --- | --- | --- | --- |
| | 1st Minute | Ea. Add'l Minute | |
| 1–17 | 11 cents | 09 cents | 21.6 cents |
| 18–22 | 15 cents | 13 cents | 21.6 cents |
| 23–28 | 21 cents | 19 cents | 21.6 cents |
| 29–34 | 25 cents | 24 cents | 21.6 cents |
| 35–41 | 31 cents | 30 cents | 21.6 cents |
| 42–51 | 36 cents | 35 cents | 21.6 cents |
| 52–66 | 41 cents | 40 cents | 21.6 cents |
| 67–81 | 43 cents | 42 cents | 21.6 cents |
| 82–105 | 45 cents | 44 cents | 21.6 cents |
| Over 105 | 47 cents | 47 cents | 21.6 cents |

It is only for the shortest of short-haul calls that the IXC access charge exceeds the LEC rate set by the PUC. Overall, it is clear from the chart that IXCs would lose money on intraLATA long-distance calls only if virtually all their intraLATA business were such shortest of short-haul calls. The PUC, through the adopted examiners' reports, found that the IXCs failed to establish they would lose money overall or be at a competitive disadvantage.

Just as the PUC is not required to set rates so that the local companies will make a profit off of each and every telephone call, the PUC is not required to set access

charges so that IXCs are guaranteed a profit off of each call. Furthermore, under the Commission's fact findings, even if the IXCs would lose money from intraLATA toll service, that would not be unreasonably discriminatory. The IXCs can choose which intraLATA markets, if any, in which they wish to offer their services. Also, only the IXCs can offer interLATA business, and if offering intraLATA service at a loss attracts enough interLATA business for them to make a profit, the decision to compete for intraLATA business is theirs, and not the PUC's.

The PUC, to protect universal service, could have decided to exclude the IXCs from offering intraLATA toll service at all, and could have done so by the mechanism of making the access charges too high for IXCs to use their connections for intraLATA calls. The PUC found that the line-side connections did not allow the LECs to know whether the IXCs made the access for an intraLATA or an interLATA call, so the pricing mechanism would have been all that was available to prohibit IXC intraLATA calls. From the examiner's reports, I do not understand this to be what the PUC intended, however. It appears the Commission found the access rates it set would allow the IXCs a reasonable overall profit from intraLATA toll service, and that the IXC's claims they would be put at a competitive disadvantage vis-a-vis the LECs simply were not established by their evidence.

The court further properly rejects the respondents' argument that the PUC had to adopt a completely non-discriminatory rate structure to comply with sections 45 and 47 of PURA. Those sections state, "No public utility may" adopt charges that discriminate against its competitors. They apply to utilities setting their own side rates, and do not limit the PUC in its discretion in rate design. As this court has already held, with respect to the PUC's discretion in rate design, the relevant section of PURA is section 38 and the PUC may adopt discriminatory rates so long as they are not unreasonably discriminatory. *Texas Alarm & Signal*, 603 S.W.2d at 772.

Without citation to any authority, the court of appeals held that the PUC's findings of past discrimination in favor of the OCCs could not justify requiring them to pay a larger share of NTS costs for a limited time in the future. 735 S.W.2d at 870. I would expressly disapprove that language and holding. The PUC should have discretion to set rates to correct past discrimination.

### d. *Intermediate Fact Findings and the Charter–Medical Case*

Several respondents argue that this court should nevertheless affirm the reversal and remand by the court of appeals because the fact findings by the PUC were not "intended" to be distinctions between IXCs and LECs but constitute "post hoc rationalizations" of the PUC orders. Such respondents argue that because the PUC did not expressly state as a finding of fact or a conclusion of law that the access charge system was not unreasonably discriminatory *because* the IXCs could use intraLATA toll business to attract new customers or enhance their interLATA business, which they alone could offer, the findings are insufficient. Respondents would apparently require the PUC to adopt findings further explaining its decision and put them in the form of the rate design theory advocated by respondents which the PUC expressly rejected. For authority such respondents cite *Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446 (Tex.1984) and cases following it.

The court properly rejects this attempt to misapply the *Charter Medical* case. We have written that the *Charter Medical* decision "explain[s] in detail what findings of fact and conclusions of law the Commission must make in granting or denying a certificate of need." *Texas Health Facilities Comm'n v. Presbyterian Hospital North*, 690 S.W.2d 564, 565 (Tex.1985). This is not a certificate of need or financial institution charter issuance administrative proceeding in which the administrative body must make specific statutory findings. This is a rate design case in which the legislature through PURA has set broad objectives

which the Commission must follow and some findings which the Commission must make but has given the Commission broad discretion in deciding which factors it will consider in its rate design decision. *See Texas Alarm & Signal*, 603 S.W.2d at 772–73. If the statutory factors are addressed and the findings and conclusions as clarified by the adopted examiner's reports reasonably set forth the reasons for the administrative body's action, the fact-finding requirement of *Charter Medical* to support the ultimate fact findings is satisfied. *State Banking Board v. Allied Bank*, 748 S.W.2d 447, 449 (Tex.1988). In particular, courts are not to use the *Charter Medical* decision to require "intermediate" findings, a precise form of findings, or new "component parts to [be subjected to] a newly-minted, hypertechnical standard of review." *Id.* at 448–49. The voluminous Commission orders, findings, conclusions, and reports in this case addressed all the required statutory factors and adequately set forth the reasons for its decision so that all parties could adequately present their positions on appeal. There was no error in the Commission's failure to make numerous other intermediate, explanatory or differently-shaded findings to satisfy one or another of the many parties to the agency proceedings.

### e. *Administrative Convenience*

There are numerous findings and conclusions in the administrative record, some of which I have quoted and several others that I decline to quote, that the rate design the PUC adopted causes the least disruption to existing Texas telephone utilities and consumer customers and is the easiest to administer on a short-term basis until further study discloses what would be a more optimal solution. The PUC orders left intact the state-wide pooling and settlements process on which small rural telephone companies rely for their existence, at least to the extent it could be left in place, but adopted an access charge system for intraLATA toll calls of IXCs that mirrored the access charge system mandated by the federal courts for IXC interLATA toll calls.

These proceedings were brought by the Commission with deadlines effectively imposed by federal court orders which required a relatively immediate short-term response. This court has alluded to administrative convenience as a factor which may be given weight by the PUC. *See Texas Alarm & Signal*, 603 S.W.2d at 771–72 and 772 n. 7. I would now expressly hold that the PUC had discretion, based on its findings of administrative convenience supported by substantial evidence in the record, to conclude that any discriminatory elements of the rate design it adopted as a temporary measure were reasonable. This ground alone supports the PUC's conclusion that the rate design was not unreasonable discriminatory to the IXCs. Like correction of past discrimination, it should be recognized as an independent ground for upholding the PUC's orders.

For the foregoing reasons, I agree with the court's judgment and opinion. The opinion simply does not go far enough.

SPEARS, GONZALEZ and DOGGETT, JJ., join in this concurring opinion.