TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-01-00114-CV







Southwestern Bell Telephone Company and Southwestern Bell Communications


Services, Inc., d/b/a Southwestern Bell Long Distance, Appellants



v.



Public Utility Commission of Texas; Max Yzaguirre, Chair of the Public Utility Commission


of Texas; Rebecca Klein, Commissioner of the Public Utility Commission of Texas;


Brett A. Perlman, Commissioner of the Public Utility Commission of


Texas; and AT&T Communications of Texas, L.P., Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT


NO. GN100469, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING







 Southwestern Bell Telephone Company ("SWBT"), in an original action in district
court, sued the Public Utility Commission ("PUC") and its commissioners for declaratory,
mandamus, and injunctive relief. (1) AT&T Communications of Texas, L.P. ("AT&T") and
Southwestern Bell Communications Services, Inc. ("SWBCS") intervened in the cause, the former
in opposition to and the latter in support of SWBT's causes of action. SWBT and SWBCS appeal
now from a district-court order denying SWBT's application for a temporary injunction restraining
certain agency actions pending final hearing in district court. We will reverse the order and remand
the cause to the district court.


THE CONTROVERSY


 The material facts appear to be undisputed. SWBT provides telecommunications
services in a specified "local access and transport area." Because SWBT is a local-exchange
company, it may not provide long-distance service between a point within the area and a point
outside the area. AT&T and SWBCS compete in providing such long-distance service. SWBCS
is an affiliate of SWBT but is, and is required to be, a separate legal entity. See 47 U.S.C.A. §§ 271,
272 (West Supp. 2001). To connect an intrastate long-distance call to SWBT's local network, long-distance carriers such as AT&T and SWBCS must pay SWBT a "switched-access charge." The
amount SWBT charges is the subject of the present controversy.

 The legislature amended the Public Utility Regulatory Act (PURA) in 1995 by adding
provisions for "incentive regulation" to "provide a framework for an orderly transition" from
traditional rate-of-return regulation for local-exchange companies that elected to be governed by the
new form of regulation. Tex. Util. Code Ann. ("PURA" hereafter) § 58.001(1) (West 1998). 
SWBT, an "incumbent local exchange company," elected to be governed by the new incentive-regulation statutes. See id. §§ 58.001, .002-.267. The legislature in 1997 added to the incentive-regulations as follows:


§ 58.025. Complaint or Hearing


(a) An electing company is not, under any circumstances, subject to a complaint,
hearing, or determination regarding the reasonableness of the company's:

 (1) rates;


 (2) overall revenues;


 (3) return on invested capital; or


 (4) net income.


(b) This section does not prohibit a complaint, hearing, or determination on an
electing company's implementation and enforcement of a competitive safeguard
required by Chapter 60.



Id. § 58.025.

 Reasonable rates, overall revenues, return on invested capital, and net income are, of
course, elements of rate-of-return regulation--the regulatory regime replaced by SWBT's election
to submit to the incentive-regulation provisions of PURA. See id. §§ 58.051-.065.

 The legislature added further to the incentive-regulation provisions in 1999. The
1999 amendments included the following:


§ 58.301. Switched Access Rate Reduction


An electing company with greater than five million access lines in this state [which
includes SWBT] shall reduce its switched access rates on a combined originating and
terminating basis (2) as follows:


(1) the electing company shall reduce switched access rates on a combined
originating and terminating basis in effect on September 1, 1999, by one cent a
minute; and


(2) the electing company shall reduce switched access rates on a combined
originating and terminating basis by an additional two cents a minute on the
earlier of:


 (A) July 1, 2000; or


 (B) the date the electing company, or its affiliate formed in compliance
with 47 U.S.C. Section 272, as amended, actually begins providing
interLATA services (3) in this state in accordance with the authorization
required by 47 U.S.C. Section 271, as amended.



§ 58.302. Switched Access Rate Cap


(a) An electing company may not increase the per minute rates for switched access
service on a combined originating and terminating basis above the lesser of:


 (1) the rates for switched access services charged by that electing company on
September 1, 1999, as may be further reduced on implementation of the
universal service fund under Chapter 56; or


 (2) the applicable rate described by Section 58.301 as may be further reduced
on implementation of the universal service fund under Chapter 56.


(b) Notwithstanding Subchapter F, Chapter 60, but subject to Section 60.001, an
electing company may, on its own initiative, decrease a rate charged for
switched access service to any amount above the long run incremental cost of
the service.



§ 58.303. Switched Access Charge Study


(a) Not later than November 1, 1999, the [PUC] shall begin a review and evaluation
of the rates for intrastate switched access service. The review shall include an
evaluation of at least the following issues:


 (1) whether alternative rate structures for recovery of switched access revenues
are in the public interest and competitively neutral; and 


 (2) whether disparities in rates for switched access service between local
exchange companies are in the public interest.


(b) The [PUC] shall file a report with the legislature not later than January 1, 2001. 
The report must include the [PUC's] recommendations on the issues reviewed
and evaluated.


(c) This section expires September 1, 2001.



Id. §§ 58.301, .302, .303 (West Supp. 2001) (footnotes omitted and added).

 The PUC fixed the amount of SWBT's pre-1995 switched-access charges when the
company was under rate-of-return regulation. The agency purposely fixed the amount above
SWBT's related costs to compensate for the costs SWBT incurred in providing basic telephone
service to all its customers as required by the statutory and agency policy of "universal service." See
Public Util. Comm'n v. Allcomm Long Distance, Inc., 902 S.W.2d 662, 664 (Tex. App.--Austin
1995, writ denied). After SWBT elected to be governed by incentive regulation, the amount of the
company's fixed-access charges was arrested for a time at the pre-1995 amount, as provided in
PURA sections 58.054-.267, then reduced thereafter according to the one-cent and two-cent
incremental reductions mandated by PURA sections 58.301 and 58.302. (4) The subtractions left
SWBT's switched-access charges at their current amount.

 AT&T complained to the PUC that the current amount was so high that AT&T could
not recover its related operating expenses, to its disadvantage in its competition with SWBCS in the
intrastate long-distance market. While SWBCS paid the same amount as AT&T for switched-access
service, SWBCS's status as a SWBT affiliate allegedly resulted in a subsidization of SWBCS's long-distance rates and an unjust and unfair profit for SWBT, derived from switched-access charges that
were allegedly anti-competitive, predatory, discriminatory, and unreasonably preferential.

 AT&T prayed that the amount of SWBT's current switched-access charges be
reduced after an agency hearing to equal the amount of SWBT's costs for providing the service. For
interim relief, AT&T requested that the PUC order SWBT to reduce the amount of its charges to
"match" the amounts fixed by the Federal Communications Commission for switched-access charges
on interstate calls.

 After receiving AT&T's complaint, the PUC: (1) assigned a docket number to the
agency proceeding initiated by the complaint; (2) determined the agency had jurisdiction to grant
some form of relief pursuant to the complaint; (3) requested the State Office of Administrative
Hearings (SOAH) to assign an administrative-law judge to conduct a hearing and submit to the
agency a proposal for decision; and, (4) issued a preliminary order outlining the course of the agency
proceeding and the issues to be addressed, leaving it to the parties to raise other issues, if they
wished, other than questions pertaining to the PUC's jurisdiction, the agency's authority to consider
the AT&T complaint, and whether a "flow-through of reductions to SWBT's rates for switched-access services is necessary." The preliminary order also declared as follows:


The [PUC] has not ordered or has yet to determine if it should order reductions in
SWBT's switched access rates. Therefore, the [PUC] believes it premature to
address issues related to flow-through of reductions to access charges until such
reductions are deemed appropriate.



(Emphasis added.)

 By requiring that the hearing be conducted by an administrative-law judge supplied
by SOAH and an attendant proposal for decision, the PUC has plainly indicated its intention to
conduct a contested-case or adjudicative-type hearing directed at determining SWBT's legal rights
respecting the current amount of its switched-access charges, as opposed to an exercise of the
agency's investigatory power. See PURA § 14.053 (West 1998); Tex. Gov't Code Ann.
§§ 2001.003(1), .058, .062 (West 2000). (5) A resulting agency decision would be subject to judicial
review under the substantial-evidence scope and manner of review. See PURA § 15.001 (West
1998).

 SWBT sued the PUC in the present cause, alleging the agency lacked jurisdiction (6)
to reduce the amount of the company's switched-access charges or to hold a hearing for that purpose. 
For permanent relief, SWBT requested declaratory, mandamus, and injunctive relief accordingly. 
SWBT also applied for a temporary injunction restraining the PUC pendente lite from reducing the
charges and from holding an adjudicative hearing for that purpose. In an order signed March 14,
2001, the district court denied the application. SWBT brings now an interlocutory appeal from that
order.


DISCUSSION AND HOLDINGS


 The parties join issue on whether the district court abused its discretion by denying
SWBT's application for temporary injunction. See Beaumont Bank v. Buller, N.A., 806 S.W.2d 223,
226 (Tex. 1991); State v. Walker, 679 S.W.2d 484, 485 (Tex. 1984).

 The merits of SWBT's causes of action are yet to be determined by the district court;
the purpose of the requested temporary injunction is ancillary to that adjudication. A temporary
injunction "may be and usually is issued in connection with any species of litigation where it is
necessary to preserve the status quo pending a final determination of the rights of the parties." 
Turcotte v. Alice Nat'l Bank, 402 S.W.2d 894, 896 (Tex. 1966); see Tex. Civ. Prac. & Rem. Code
Ann. § 65.011 (West 1997). The district court was thus required to "determine how best to create
or preserve a state of affairs such that it will be able upon conclusion of the full trial to render a
meaningful decision for either party." Developments in the Law--Injunctions, 78 Harv. L. Rev. 994,
1056 (1965) (emphasis added). Having acquired jurisdiction in the present cause, the district court
could "grant any writ, including the writ of injunction, necessary to administer justice between the
parties, preserve the subject matter of the litigation, and make its judgment effective." City of Dallas
v. Wright, 36 S.W.2d 973, 975 (Tex. 1931) (emphasis added).

 "The principles, practice, and procedure governing courts of equity shall govern
proceedings in injunctions when the same are not in conflict with these rules or the provisions of the
statutes." Tex. R. Civ. P. 693. (7) In cases like the present, the grant or denial of SWBT's application
for temporary injunction depended upon whether the company showed (1) a probable, imminent, and
irreparable injury that would occur before trial if the writ did not issue, and (2) a probable right,
following trial on the merits, to the permanent relief SWBT requested in its petition. See Walling
v. Metcalfe, 863 S.W.2d 56, 57 (Tex. 1993); Harry M. Reasoner, Equity--Injunctions--Practice and
Procedure--Criteria for Granting a Temporary Injunction when Only Questions of Law are
Presented, 40 Tex. L. Rev. 409, 411 (1962).

 Probable Injury. The current amount of SWBT's switched-access charges is the
result of the company's unquestioned compliance with PURA sections 58.054, 58.301, and 58.302. 
SWBT contends it therefore has a statutory right to charge the current amount and, for reasons
discussed hereafter, a statutory immunity from any PUC hearing questioning that amount for the
purpose of reducing it further to cure its allegedly anti-competitive, discriminatory, prejudicial, or
unreasonably preferential effects. SWBT contends accordingly that the PUC lacks jurisdiction to
modify the amount of switched-access charges mandated by the legislature or to conduct a hearing
for that purpose. The PUC and AT&T contend the agency has jurisdiction to hold such a hearing
and the power to reduce the amount of switched-access charges, if necessary, even if their amount
is the result of compliance with the legislative mandates set out in PURA sections 58.054, 58.301,
and 58.302. The controversy turns ultimately on the foregoing issues.

 If SWBT's contentions are ultimately sustained by the district court, after a trial on
the merits, it will be a meaningless and hollow victory if the agency has in the period before trial
conducted a hearing and reduced the current amount of SWBT's switched-access charges, thereby
extinguishing SWBT's claimed rights by actions the district court will have held ultra vires and
unlawful. It appears to us then that a temporary injunction is the only practical and effective remedy
to prevent such an eventuality. The statutory rights claimed by SWBT, if they exist, are larger than
and different in character from a moral right to be free from the mere expense associated with a
hearing before the PUC. The substance of SWBT's claimed rights is a right to be free of agency
regulation in particulars the legislature has reserved for itself as the sovereign's immediate
representatives. It seems to us then that the rights claimed by SWBT cannot be measured by a
pecuniary standard or compensated by money if destroyed by unlawful agency action.

 We therefore hold there is no reasonable basis in the record for a conclusion that
SWBT is not exposed to a probable injury by reason of the PUC's preliminary order. See City of
Sherman v. Public Util. Comm'n of Tex., 643 S.W.2d 681, 686 (Tex. 1983); Rutherford Oil Corp.
v. General Land Office, 776 S.W.2d 232, 236 (Tex. App.--Austin 1989, no writ); Sexton v. Mount
Olivet Cemetery Ass'n, 720 S.W.2d 129, 145 (Tex. App.--Austin 1986, writ ref'd n.r.e.); see
generally Westheimer Indep. Sch. Dist. v. Brockette, 567 S.W.2d 780, 785 (Tex. 1978).

 Probable Right to Recover. Unless SWBT shows a probable right to declaratory,
mandamus, or injunctive relief after trial on the merits, it does not establish a right to equitable relief
in the form of a temporary injunction. How "probable" must the showing be? "At the hearing for
a temporary writ of injunction, the applicant is not required to establish that [it] will prevail on final
trial, . . . the only question before the trial court is whether the applicant is entitled to preservation
of the status quo pending trial on the merits." Walling, 863 S.W.2d at 58 (emphasis added).

 "Clear evidence of irreparable injury should result in a less stringent requirement of
certainty of victory; greater certainty of victory should result in a less stringent requirement of proof
of irreparable injury." Developments in the Law--Injunctions at 1056; see Louis L. Jaffe, Judicial
Control of Administrative Action 694-97 (1965). We believe this sliding scale measures
substantially in SWBT's favor--the company's claimed statutory rights are clearly exposed to
extinction by the preliminary order as discussed above, resulting "in a less stringent requirement of
certainty of victory" after trial on the merits.

 In any case, SWBT is required to show only "that a bona fide issue exists as to [the
company's] right to ultimate relief" by way of declaratory judgment, mandamus, or permanent
injunction. 6 Hamilton Lowe Remedies § 153, at 188 (Texas Practice 2d ed. 1973); see Reasoner, 
at 411. We believe the record certainly demonstrates such a bona fide issue as to SWBT's claimed
statutory rights and the PUC's alleged want of jurisdiction.

 The following propositions are beyond dispute: The PUC is a subordinate body that
derives all its powers from the legislature and exercises those powers subject to legislative control. 
See City of El Paso v. Public Util. Comm'n, 584 S.W.2d 545, 547 (Tex. Civ. App.--Austin 1979,
no writ). And where the legislature qualifies a delegated power by specifying a method for its
exercise, "[t]he prescribed method excludes all others, and must be followed." Cobra Oil & Gas
Corp. v. Sadler, 447 S.W.2d 887, 892 (Tex. 1968); see also Foster v. City of Waco, 255 S.W. 1104,
1105 (Tex. 1923). "An administrative agency . . . is a creature of statute and must live within the
statutes" entrusted to its administration. Balios v. Tex. Dept. of Pub. Safety, 733 S.W.2d 308, 311
(Tex. App.--Amarillo 1987, writ ref'd). And "[i]t lies within the judicial power . . . to say with final
authority what a statute means." Amarillo Indep. Sch. Dist. v. Meno, 854 S.W.2d 950, 955 n.6 (Tex.
App.--Austin 1993, writ denied).

 As we understand the record, SWBT contends its unquestioned compliance with
PURA sections 58.054 (arresting the company's switched-access charges at the 1995 amount), and
58.301-.302 (providing for incremental reductions of the 1995 amount) gives the company a
statutory right to charge the resulting current amount for switched-access service. The effect of these
statutes, SWBT contends, is to deprive the PUC of the power to suspend in whole or in part the
statutory reductions or the current amount, find circumstances in which they do not apply in whole
or in part, or reduce them for any reason or purpose, all under the authorities set forth above. We
believe the PUC's preliminary order indicates clearly that the agency claims a power to take one or
more of these actions, leaving the issue to be whether the agency's delegated powers include
authority to take any such substantive action.

 SWBT contends in addition that the orchestrated effect of PURA sections 58.054,
58.301, and 58.302 is to deprive the PUC of any power to conduct an administrative hearing for the
purpose of reviewing or modifying the amount of switched-access charges resulting from SWBT's
undisputed compliance with those statutes. SWBT gives two reasons for this contention. First, the
validity of these statutes is not challenged; and, because the legislature has therein exercised its
residual power to fix the amount an electing company such as SWBT may charge for its switched-access service, by specified one-cent and two-cent reductions at stated intervals, these statutes
necessarily exclude any power in the PUC to do so. SWBT therefore concludes the PUC lacks
authority to conduct a hearing questioning the validity of the resulting amount for any regulatory
purpose, just as the agency lacks jurisdiction to conduct a hearing for the purpose of questioning the
amount of switched-access charges fixed by the Federal Communications Commission for SWBT's
interstate connections. The amount of SWBT's charges is therefore binding as a matter of law on
the PUC, SWBT, and all others subject to the general laws, until the statutes mentioned are modified
by the legislature itself.

 Second, SWBT contends PURA section 58.025(a) expressly forbids the PUC to
entertain a complaint, conduct a hearing, or make "any determination regarding the reasonableness
of the company's . . . rates." (8) The hearing required by the preliminary order is of that prohibited
character, SWBT contends, as opposed to a permissible hearing regarding "the company's
implementation and enforcement of a competitive safeguard required by Chapter 60" of PURA, as
stated in PURA section 58.025(b). SWBT reasons thusly: The reasonableness of SWBT's 1995
switched-access charges was established when the amount thereof was approved originally by the
PUC and validated afterwards when the legislature fixed the 1995 amount as the minuend from
which the incremental reductions required by PURA sections 58.301 and 58.302 were subtracted to
arrive at the amount SWBT currently charges for switched-access service. When the PUC
undertakes to conduct a hearing to review and perhaps revise the current amount by further
reductions, in SWBT's view the agency is actually subjecting the 1995 amount to a hearing because
the current amount is no more than the 1995 amount as reduced by the legislature in PURA sections
58.301 and 58.302. Stated another way, the 1995 amount is the only amount that could possibly be
questioned by the PUC because the reductions made therefrom were mandated to the penny by
legislative enactments to which the PUC owes obedience; and PURA section 58.025(a) expressly
forbids a hearing in which the reasonableness of the 1995 amount might be questioned.

 This is, in our view, not an unreasonable interpretation of the statutes in question. 
The correctness of that interpretation is not, of course, before us in the present appeal. We note in
passing, however, that denying SWBT's application for temporary injunction certainly does not
preserve the status quo insofar as SWBT's claimed right to a statutory exemption from an agency
hearing is concerned. Rather, the denial of SWBT's application, in the present circumstances, is in
effect a decision on the merits that the right does not exist or, if it does, the PUC may lawfully
extinguish it in the interim before trial.

 The PUC and AT&T raise several arguments against the likelihood SWBT will
prevail after a trial on the merits. They point first to PURA section 58.025(b). That statute states
expressly that an electing company's statutory exemption from a hearing as to the reasonableness
of its rates "does not prohibit a . . . hearing or determination on [the company's] implementation and
enforcement of a competitive safeguard required by Chapter 60" of PURA. These safeguards are
implicit in several provisions found in Chapter 60. In general, they forbid the charging of rates that
are discriminatory, anti-competitive, unreasonably preferential, prejudicial, unjust, or unfair. (9) To
the extent any of these competitive safeguards may ultimately be shown to apply to the present
controversy, we believe they are simply issues, aspects, or elements of a bona fide dispute between
the parties involving complicated issues of statutory construction in matters of importance to all the
parties. In this connection, we note the following observations:


 [O]ur system of procedure is such that legal rights cannot be finally determined upon
a hearing relating to the wisdom or expediency of issuing a status quo order.
Deliberate action is essential for the accurate determination of legal rights and upon
occasion this can be secured only by issuing a temporary decree protecting a status
quo.



Southwest Weather Research, Inc. v. Jones, 327 S.W.2d 417, 421 (Tex. 1959); see, e.g., Johnson v.
Austin, 674 S.W.2d 894, 899-900 (Tex. App.--Austin 1984, no writ); Baucum v. Texam Oil Corp.,
423 S.W.2d 434, 440-41 (Tex. Civ. App.--El Paso 1967, writ ref'd n.r.e.); Long v. Employers Cas.
Co., 392 S.W.2d 161, 162 (Tex. Civ. App.--Waco 1965, no writ). In other words, the legal or
factual issues of a case may themselves dictate that an accurate assessment and determination of
legal rights can be secured only by a temporary injunction. We believe that is the case here where
the controversy involves competing public interests and policies, the delicate relationship of court
and agency, and a possible need to harmonize the provisions of a complicated statutory system. See,
e.g., Lumberton Mun. Util. Dist. v. Cease, 596 S.W.2d 601, 603 (Tex. Civ. App.--Beaumont 1980,
no writ).

 We cannot see that any of the various statutory powers of the PUC clearly negate
SWBT's claims and statutory-construction arguments. If they do have that effect in the end, it will
only be by way of judicial construction of all the pertinent statutes in context. The dispute is, in
other words, bona fide as to the PUC's jurisdiction and SWBT's claimed statutory rights.

 AT&T and the PUC raise certain other contentions, apart from issues of statutory
construction, in support of their position that SWBT has not shown a likelihood of prevailing after
trial on the merits. They assert first that SWBT's lawsuit is premature because the company has not
exhausted its administrative remedies. We believe the exhaustion doctrine is not applicable here. 
The doctrine is subject to several exceptions. It does not apply, for example, when the agency's
jurisdiction is questioned, as it is here, on persuasive grounds. See, e.g., City of Sherman v. Public
Util. Comm'n, 643 S.W.2d 681, 683 (Tex. 1983); Jaffe at 515. AT&T contends also that the
primary-jurisdiction doctrine defeats any likelihood that SWBT will prevail after trial on the merits. 
This doctrine ensures that administrative agencies are not circumvented on issues that have been
committed to them by statute for an original decision. See Gregg v. Delhi-Taylor Oil Corp., 344
S.W.2d 411, 413-14 (Tex. 1961); Jaffe at 121. Applicability of the doctrine depends upon whether
a particular power has been delegated to the agency. We believe SWBT has raised a bona fide issue
concerning whether the legislature has delegated to the PUC a power to reduce further SWBT's
switched-access charges or a power to conduct a hearing to inquire in that regard. Consequently,
neither the exhaustion nor the primary-jurisdiction doctrine necessarily or clearly precludes any
likelihood that SWBT will prevail after trial on the merits.

 AT&T and the PUC contend finally that judicial interference with the agency
proceeding is prohibited because the hearing itself is within the PUC's various regulatory powers
even if the agency lacks jurisdiction to grant a particular remedy, such as a further reduction of
SWBT's switched-access charges to prevent their having an anti-competitive or discriminatory
effect. See Texas Educ. Agency v. Cypress-Fairbanks Indep. Sch. Dist., 830 S.W.2d 88, 90-91 (Tex.
1992). We believe Cypress-Fairbanks is plainly distinguishable. The Court held in that case that
the statutory authority delegated to the Commissioner of Education included authority to consider
the claims of school employees at least for some purposes, even if the Commissioner was powerless
to finally adjudicate those claims or grant full relief in the form of money damages or injunctive
relief. See id. In contrast, SWBT has shown a bona fide dispute regarding whether the PUC is
entirely without power to reduce further the company's switched-access charges for any purpose,
and contends indeed that the legislature has withdrawn the matter of the amount of such charges
from the PUC's authority for all purposes, save enforcement of the residue left after SWBT's
undisputed compliance with PURA sections 58.054, 58.301, and 58.302.

 Two factors remain to be considered regarding the grant or denial of the temporary
injunction for which SWBT applied: (1) the public interest and (2) the matter of comparative injury,
that is to say, a balancing of the "equities" and hardships attending one course or the other. See
General Tire & Rubber Co. v. Texas Pac. Coal & Oil Co., 102 S.W.2d 1086, 1089 (Tex. Civ.
App.--Fort Worth 1937, writ ref'd).


 The public interest is not necessarily in the solution adopted by the agency. . . . [T]he
public interest is often identified with settling an issue right rather than settling it
quickly. . . . The evaluation of the public interest factor upon [application] for a stay
impliedly poses the question whether the public interest requires that the individual
be harmed before the legality of that harm is established.



Jaffe at 693. No public-interest factor has been brought to our attention, and we are unable to
imagine one, which requires that SWBT's claimed statutory rights must be extinguished before a
trial on the merits is held to determine that such destruction is within the PUC's delegated powers
and therefore a lawful destruction. SWBT's claimed statutory rights are unquestionably exposed to
that destruction by reason of the PUC's preliminary order; the PUC and AT&T are faced only with
delay before their asserted interests in competitive, nondiscriminatory, just, and fair rates are
vindicated by a trial on the merits, should that be the district-court judgment. We believe, therefore,
that the public-interest factor and the factor of comparative injury weigh heavily in favor of SWBT.

 For the reasons given, we believe the record shows on undisputed facts that SWBT
has clearly raised a bona fide issue as to its right to recover on its claims after a trial on the merits;
and, there is no basis in the record from which a contrary inference might reasonably be drawn. We
are compelled then to hold the district court abused its discretion by failing to apply the law correctly
to the undisputed facts. See Southland Life Ins. Co. v. Egan, 86 S.W.2d 722, 723 (Tex. 1935).

 We remand the cause to the district court for issuance of a proper temporary
injunction consistent with our opinion. We point out in this connection that where an injunction is
proper, as it is here, "it must be drawn with such specificity so as to remedy only the particular harm
complained of; an injunction drawn too broadly" is improper. 2 Am. Jur. 2d Administrative Law
§ 552, at 543 (2000). By this, we mean the contested case may proceed in the PUC for purposes
unrelated to the validity of SWBT's current switched-access charges.



 

 John E. Powers, Justice

Before Justices Yeakel, Patterson and Powers*

Reversed and Remanded

Filed: July 26, 2001

Publish






* Before John E. Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment.
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. The commissioners named as defendants are Max Yzaguirre (chairman), Rebecca Klein,
and Brett A. Perlman. They have joined in the PUC's appellate brief and our references hereafter
to the PUC include them. This appeal was originally filed in the names of the predecessors to the
present commissioners. We have substituted the current holders of those offices as the correct
parties to this proceeding. See Tex. R. App. P. 7.2(a).
2. The term "combined originating and terminating basis" refers to long-distance calls
originating from or terminating in a local-exchange company's "local access and transport area."
3. The term "interLATA services" refers to telecommunications between a point within a 
"local access and transport area" and a point outside that area.
4. It is not essential that rates be fixed by an administrative body to which the legislature has
delegated the power; the legislature is free to fix rates directly. In 1882, for example, the legislature
by statutory enactment reduced the maximum passenger fares that railroads may charge from five
cents to three cents per mile. See Act approved Apr. 14, 1882, 17th Leg., C.S., ch. 4, § 1 [1879-1889
Tex. Gen. & Spec. Laws] 3, 3, reprinted in 9 H.P.N. Gammel, The Laws of Texas 1879-1889, at 3,
3 (Austin, Gammel Book Co. 1898) (since repealed); Abner Eddins Lipscomb, Judicial Control of
Administrative Action in Texas, The Baylor Bulletin, Law Number, at 10 (1938).
5. PURA section 14.053 directs that the utility division of SOAH "shall conduct each hearing
in a contested case that is not conducted by one or more commissioners." Texas Government Code
section 2001.003(1) defines "contested case"; section 2001.058 outlines the procedures governing
contested cases conducted by SOAH; and, section 2001.062 contains provisions governing the
proposal-for-decision practice in such cases.
6. In the present context, the word "jurisdiction" refers to an administrative agency's power
to hear and determine issues of fact and law and to carry into effect any resulting agency decision. 
See In re N.J.A., 997 S.W.2d 554, 559 (Tex. 1999); Stauffer v. City of San Antonio, 344 S.W.2d 158,
161 (Tex. 1961). Being a statutory creature without inherent power, the PUC has only those powers
delegated to it in a valid statute. See Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137
(Tex. App.--Austin 1986, writ ref'd n.r.e.).
7. Section 15(a) of the 1961 Model State Administrative Procedure Act, from which the Texas
Administrative Procedure Act is largely derived, provides that "[a] preliminary, procedural, or
intermediate agency action or ruling is immediately reviewable [by a court] if the final agency
decision would not provide an adequate remedy." Revised Model State Administrative Procedure
Act § 15(a), 14 U.L.A. 430 (1961); see Tex. Gov't Code Ann. § 2001.001 et seq. (West 2000). The
provision was eliminated from the Texas act "at the request of several major agencies concerned that
intermediate appeals could unreasonably delay final administrative action" and because it was
difficult to imagine a case where the final agency action would not provide an adequate remedy. 
Dudley McCalla, The Administrative Procedure and Texas Register Act, 28 Baylor L. Rev. 445, 462
(1976). Deletion of the model-act provision necessarily refers the matter to the reviewing court's
equity power.
8. The word "rates" includes switched-access charges. See PURA § 11.001(15)(A) (West
1998). 
9. See PURA § 60.001 (PUC must "ensure that the rates and rules of an incumbent local
exchange company: (1) are not unreasonably preferential, prejudicial, or discriminatory"; and (2) that
"they are applied equitably and consistently"); PURA § 60.002 (vests "exclusive jurisdiction" in the
PUC "to implement competitive safeguards" to achieve those objectives and states explicitly that
PURA "[s]ection 58.025 does not prevent the [PUC] from enforcing" Chapter 60); PURA § 60.061
(requires the PUC to "adopt rules governing imputation of the price of a service," defining
"imputation" as "a regulatory policy the commission shall apply to prevent an incumbent local
exchange company from selling a service or function to another telecommunications utility at a price
that is higher than the rate the incumbent local exchange company implicitly includes in services it
provides to the company's retail customers"); PURA §§ 60.001, .002, .061 (West 1998). Section
60.063 of PURA provides that the PUC "shall impute the price of switched access service to the
price of each service for which switched access service is a component until switched access service
is competitively available." Id. § 60.063.



irman), Rebecca Klein,
and Brett A. Perlman. They have joined in the PUC's appellate brief and our references hereafter
to the PUC include them. This appeal was originally filed in the names of the predecessors to the
present commissioners. We have substituted the current holders of those offices as the correct
parties to this proceeding. See Tex. R. App. P. 7.2(a).
2. The term "combined originating and terminating basis" refers to long-distance calls
originating from or terminating in a local-exchange company's "local access and transport area."
3. The term "interLATA services" refers to telecommunications between a point within a 
"local access and transport area" and a point outside that area.
4. It is not essential that rates be fixed by an administrative body to which the legislature has
delegated the power; the legislature is free to fix rates directly. In 1882, for example, the legislature
by statutory enactment reduced the maximum passenger fares that railroads may charge from five
cents to three cents per mile. See Act approved Apr. 14, 1882, 17th Leg., C.S., ch. 4, § 1 [1879-1889
Tex. Gen. & Spec. Laws] 3, 3, reprinted in 9 H.P.N. Gammel, The Laws of Texas 1879-1889, at 3,
3 (Austin, Gammel Book Co. 1898) (since repealed); Abner Eddins Lipscomb, Judicial Control of
Administrative Action in Texas, The Baylor Bulletin, Law Number, at 10 (1938).
5. PURA section 14.053 directs that the utility division of SOAH "shall conduct each hearing
in a contested case that is not conducted by one or more commissioners." Texas Government Code
section 2001.003(1) defines "contested case"; section 2001.058 outlines the procedures governing
contested cases conducted by SOAH; and, section 2001.062 contains provisions governing the
proposal-for-decision practice in such cases.
6. In the present context, the word "jurisdiction" refers to an administrative agency's power
to hear and determine issues of fact and law and to carry into effect any resulting agency decision. 
See In re N.J.A., 997 S.W.2d 554, 559 (Tex. 1999); Stauffer v. City of San Antonio, 344 S.W.2d 158,
161 (Tex. 1961). Being a statutory creature without inherent power, the PUC has only those powers
delegated to it in a valid statute. See Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137
(Tex. App.--Austin 1986, writ ref'd n.r.e.).
7. Section 15(a) of the 1961 Model State Administrative Procedure Act, from which the Texas
Administrative Procedure Act is largely derived, provides that "[a] preliminary, procedural, or
intermediate agency action or ruling is immediately reviewable [by a court] if the final agency
decision would not provide an adequate remedy." Revised Model State Administrative Procedure
Act § 15(a), 14 U.L.A. 430 (1961); see Tex. Gov't Code Ann. § 2001.001 et seq. (West 2000). The
provision was eliminated from the Texas act "at the request of several major agencies concerned that
intermediate a