AT & T COMMUNICATIONS OF TEXAS, L.P., Petitioner,

v.

SOUTHWESTERN BELL TELE-PHONE COMPANY and Southwestern Bell Communications Services, Inc. D/B/A Southwestern Bell Long Distance, Respondents.

No. 03–0789.

Supreme Court of Texas.

Argued Sept. 29, 2004.

Decided Jan. 27, 2006.

Kristen L. Worman, Hazen & Terrill, P.C., Steven Baron, Greg Abbott, Edward D. Burbach, Karen Watson Kornell, Elizabeth R.B. Sterling, Office of Atty. Gen., Austin, for Others.

Michael Byrd, Kathleen M. LaValle, Jackson Walker LLP, Dallas, R. Laurance Macon, James J. Scheske, Akin Gump Strauss Hauer & Feld, L.L.P., Shannon H. Ratliff, Ratliff Law Firm, P.L.L.C., Mark Witcher, Austin, for Petitioner.

Mary A. Keeney, Robert J. Hearon Jr., Kathryn E. Allen, Graves Dougherty Hearon & Moody, P.C., Ann Effinger Meuleman, Jose Varela Jr., Thomas Joseph Ballo, Austin, John DiBene, Pleasanton, CA, for Respondents.

Justice HECHT delivered the opinion of the Court.

For years, "Ma" Bell wielded her baby Bells' monopoly control of local telephone exchanges to stifle competition in long-distance service. Now she complains that one of the offspring, since grown and moved out,[1] is using that same power, still not dissipated by competition in local telephone service, against her. History cautions that her complaint may have substance. But the issue in this case is

---

1. None of the parties has raised with us whether the recent merger of AT & T Corp. and SBC Communications, Inc. affects the issues in this case.

whether Texas regulatory law, legislatively molded to ease the transition to competitive telecommunications markets, provides a remedy.

We must first decide whether the Public Utility Regulatory Act ("PURA" or "the Act")[2] authorizes the Public Utility Commission ("the Commission") to reduce switched access rates charged by an incumbent local exchange telecommunications carrier that has elected incentive regulation under chapter 58 of the Act, in order to prevent the anticompetitive effect of those rates on the long-distance market. We agree with the court of appeals[3] and the trial court that PURA does not give the Commission such authority. We must then consider whether, even without such authority, the Commission may conduct hearings on the alleged anticompetitive effect of switched access rates, and whether

it may include as a party to those hearings an affiliated interexchange carrier. We conclude that PURA gives the Commission broader authority to conduct such hearings than the lower courts allowed. Accordingly, we reverse the judgment of the court of appeals and remand the case to the trial court for rendition of judgment in accordance with this opinion.

## I

Before 1984, American Telephone and Telegraph Co. ("AT & T") dominated the telecommunications industry in the United States.[4] It controlled local telephone exchange service[5] through its Bell system of subsidiary utilities that owned and operated, as monopolies, the enormous networks of wires, cables, switches, and transmission facilities necessary to connect users in particular areas.[6] And according to allega-

2. TEX. UTIL. CODE §§ 11.001–64.203.

3. 112 S.W.3d 221 (Tex.App.—Austin 2003).

4. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 222 (D.D.C.1982) ("The American telecommunications industry is presently dominated by one company—AT & T. It provides local and long-distance telephone service; it manufactures and markets the equipment used by telephone subscribers as well as that used in the telecommunications network; and it controls one of the leading communications research and development facilities in the world."), *aff'd sub. nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

5. *See Verizon Commc'ns Inc. v. Federal Commc'ns Comm'n*, 535 U.S. 467, 489–490, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) ("The physical incarnation of such a market, a 'local exchange,' is a network connecting terminals like telephones, faxes, and modems to other terminals within a geographical area like a city. From terminal network interface devices, feeder wires, collectively called the 'local loop,' are run to local switches that aggregate traffic into common 'trunks.' The local loop was traditionally, and is still largely,

made of copper wire, though fiber-optic cable is also used, albeit to a far lesser extent than in long-haul markets. Just as the loop runs from terminals to local switches, the trunks run from the local switches to centralized, or tandem, switches, originally worked by hand but now by computer, which operate much like railway switches, directing traffic into other trunks. A signal is sent toward its destination terminal on these common ways so far as necessary, then routed back down another hierarchy of switches to the intended telephone or other equipment. A local exchange is thus a transportation network for communications signals, radiating like a root system from a 'central office' (or several offices for larger areas) to individual telephones, faxes, and the like." (footnote omitted)).

6. *See* 552 F.Supp. at 223 ("The key to the Bell System's power to impede competition has been its control of local telephone service. The local telephone network functions as the gateway to individual telephone subscribers. It must be used by long-distance carriers seeking to connect one caller to another. Customers will only purchase equipment which can readily be connected to the local network through the telephone outlets in their homes and offices. *The enormous cost of the*

tions by the United States in an antitrust action filed in 1974, AT & T used its control of local telephone service to disadvantage competitive providers of long-distance service and monopolize that market.[7] As the federal court in that action explained:

> AT & T has allegedly used its control of this local monopoly to disadvantage these competitors in two principal ways. First, it has attempted to prevent competing long distance carriers and competing equipment manufacturers from gaining access to the local network, or to delay that access, thus placing them in an inferior position vis-a-vis AT & T's own services. Second, it has supposedly used profits earned from the monopoly local telephone operations to subsidize its long distance and equipment businesses in which it was competing with others.[8]

The federal court approved a consent decree to foster competition among long-distance telephone service providers. The decree required AT & T to divest itself of the "baby" Bell operating companies.[9] It also called for the creation of geographic regions—now called local access and transport areas ("LATAs"), usually centered around metropolitan statistical areas—within which Bell operating companies could operate and allowed them to provide, in a given area, local exchange service and service between local exchanges [10]—intra-LATA service. The consent decree prohibited the "baby Bells" or their affiliates from operating outside their respective areas and from providing service between local exchanges in different areas [11]—inter-LATA service. A separate consent decree created similar "service market areas" ("SMAs", which we also refer to as LATAs) for local exchange carriers owned by GTE Corporation ("GTE").[12] In all, the consent decrees created 18 LATAs in Texas: 16 for Southwestern Bell Telephone Co. ("SWBT"), at that time the AT & T local exchange carrier in Texas,[13] and two for GTE Southwest, Inc. ("GTE–Southwest"), the GTE local exchange carrier in

wires, cables, switches, and other transmission facilities which comprise that network has completely insulated it from competition. Thus, access to AT & T's local network is crucial if long distance carriers and equipment manufacturers are to be viable competitors.").

7. *See id.* at 139, 223.

8. *Id.* at 223.

9. *Id.* at 141, 226–227.

10. *Id.* at 229; *see* Public Util. Comm'n of Texas, *Scope of Competition in Telecommunications Markets of Texas* at 70 (Jan.1999) [hereinafter *1999 Scope of Competition Report*] ("With the divestiture of the Bell system in 1984, the nation was divided into serving areas known as Local Access Transport Areas, or LATAs."). Since 1997, the Commission has been required to report to the Legislature before each session on the scope of competi-

tion in telecommunications markets. TEX. UTIL. CODE § 52.006.

11. 552 F.Supp. at 227; *see 1999 Scope of Competition Report, supra* note 10, at 70 ("Bell Operating Companies (BOCs) such as SWBT were not allowed to provide long-distance calling services between LATAs, but were allowed to provide intraLATA toll service.").

12. *United States v. GTE Corp.,* 603 F.Supp. 730, 746–749 (D.D.C.1984); *see 1999 Scope of Competition Report, supra* note 10, at 70.

13. Public Util. Comm'n of Texas, *Status of Competition in Long Distance and Local Telecommunications Markets in Texas* Ex. II–A (Jan. 15, 1989) [hereinafter *1989 Status of Competition Report*] (containing map showing LATAs for Abilene, Amarillo, Austin, Beaumont, Brownsville, Corpus Christi, Dallas, El Paso, Hearne, Houston, Longview, Lubbock, Midland, San Antonio, Waco, Wichita Falls).

Texas.[14]

The consent decrees required the Bell and GTE local exchange carriers over time to convert their facilities to allow equal access by all interexchange carriers, and Federal Communications Commission guidelines followed, requiring other local exchange carriers to allow equal access, too.[15] In Texas, AT & T, GTE, and a large number of smaller carriers continued to provide long-distance intraLATA and interLATA service.[16] Before the AT & T consent decree, the Bell local exchange monopolies shared in AT & T's long-distance service revenues, based on minutes of use and mileage.[17] After the divestiture, the FCC and the Commission replaced this revenue sharing with switched access rates paid by interexchange (long-distance) carriers to local exchange carriers to compensate the latter for access services, to allow them to recoup their investment in local telephone networks, and to further the long-standing national policy of universal service by subsidizing more expensive rural service and residential rates.[18] In the beginning, switched

14. *Id.* (containing map showing SMAs for Bryan and San Angelo).

15. 552 F.Supp. at 227, 232–233, 603 F.Supp. at 743–746; *see 1989 Status of Competition Report, supra* note 13, at 5–6.

16. *See 1989 Status of Competition Report, supra* note 13, at 1 (reporting that in 1989 there were 89 companies providing basic long-distance service in Texas); *id.* at 6 ("Under the consent decrees, in this state SWB and GTESW were to continue to provide local exchange service and intraLATA interexchange service, while AT & T and the OCCs [other common carriers] were allowed to provide intraLATA and interLATA interexchange service (that is, toll calling service but no local service). Interexchange telecommunications are those telephone calls which originate in one local exchange and terminate in another local exchange. Interexchange telecommunications may be either intraLATA or interLATA.").

17. *Public Util. Comm'n v. AT & T Commc'ns of the Southwest, Inc.,* 777 S.W.2d 363, 364 (Tex.1989); *see* Public Util. Comm'n of Texas, *Intrastate Switched Access Charges* at 4 (Jan. 2001) [hereinafter *2001 Switched Access Charges Report*]. The Legislature required the Commission to report on intrastate switched access rates by January 1, 2001. Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 45, 1999 Tex. Gen. Laws 4210, 4232.

18. *Public Util. Comm'n,* 777 S.W.2d at 364–365; *see 1989 Status of Competition Report, supra* note 13, at 41 ("Access charges are the means by which local telephone companies are compensated by interexchange carriers for providing access to their local networks and to the end user. The structure of access charges and the level of rates for intrastate calling in Texas were established by the Commission in 1984. The intrastate charges were modeled in large part upon the May 1984 FCC-approved system of access charges for interstate calling."); *id.* at 54 ("PURA sets forth the objective that Texas have adequate and efficient telecommunications service available to all citizens of the state at just, fair, and reasonable rates. The universal affordability of telephone service—'universal service'—has been the policy objective that has guided the regulation of the telephone industry at both the federal and state levels since Congress enacted and President Franklin D. Roosevelt signed the Communications Act of 1934."); *1999 Scope of Competition Report, supra* note 10, at viii ("Unlike electric rates, which are usually closely linked to the underlying cost of the service, local and long-distance telephone rates have historically been set with certain policy objectives in mind. Chief among these has been the universal provision of affordable service to higher cost, rural areas of Texas, where the actual cost of providing service can exceed $100/month per line. A certain amount of the revenue recovered through access charges has been used by local telephone.companies to offset these high costs of serving rural Texans."); *id.* at 33 ("The definition of universal service in telecommunications has its foundation in the Communications Act of 1934. The Act's preamble calls for a 'rapid, efficient, nationwide and world-wide wire and radio communication service with adequate facilities at reasonable charges.' The term

access rates in Texas were over $0.20 per minute.[19] The cost-of-service component of the rate was small; in 1999, the Commission estimated it at about $0.01 per minute.[20] Over the years, federal regulators have reduced switched access rates for interstate calls to near cost, while switched access rates for long-distance calls within Texas, which are subject to state regulation, have been reduced to a little less than $0.06 per minute.[21] Texas intrastate switched access rates are among the highest in the nation.[22]

The structure of telecommunications markets changed dramatically with the 1995 amendments to PURA[23] and the enactment of the federal Telecommunications Act of 1996.[24] Both statutes opened local exchange service to competition.[25] To facilitate the transition, the 1995 amendments to PURA allowed an incumbent local exchange carrier[26] to remove itself from the traditional regulatory framework and elect instead incentive regulation under what is now, as recodified and further amended, chapter 58 of the Texas Utility Code.[27] (For convenience, we shall refer to the recodified version of PURA.) An "electing" incumbent local exchange carrier was required to cap its rates for basic network services, including switched access, at September 1, 1995 levels for four

has been interpreted to mean the universal availability of adequate service at affordable rates.") (footnotes omitted); *2001 Switched Access Charges Report, supra* note 17, at 4 ("Before the divestiture of the Bell companies from AT & T in 1984, the monopoly telephone companies pooled long distance revenues and calculated payments to one another from those pools based upon minutes of use and mileage to compensate for the use of one another's networks. Simply put, switched access charges replaced the revenue sharing mechanisms of the monopoly telephone companies."); 47 U.S.C. § 254 (setting out the principles of universal access).

**19.** *See 2001 Switched Access Charges Report, supra* note 17, at 7.

**20.** *See 1999 Scope of Competition Report, supra* note 10, at viii.

**21.** *See* Public Util. Comm'n of Texas, *Scope of Competition in Telecommunications Markets of Texas* at 67 (Jan.2003) [hereinafter *2003 Scope of Competition Report*].

**22.** *See* Public Util. Comm'n of Texas, *Scope of Competition in Telecommunications Markets of Texas* at 66 (Jan.2005).

**23.** Act of May 16, 1995, 74th Leg., R.S., ch. 231, 1995 Tex. Gen. Laws 2017.

**24.** Pub.L. No. 104–104, 110 Stat. 56.

**25.** *See 1999 Scope of Competition Report, supra* note 10, at vi; 47 U.S.C. § 253.

**26.** *See* TEX. UTIL. CODE § 51.002(3), formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.002(3) (" 'Incumbent local exchange company' means a local exchange company that has a certificate of convenience and necessity on September 1, 1995."); *1999 Scope of Competition Report, supra* note 10, at 89 ("As its name implies, an ILEC [incumbent local exchange carrier] is the company that provided basic local exchange telecommunications service to a local exchange prior to competition being allowed on the local level (*i.e.,* the company had a certificate of convenience and necessity (CCN) by September 1, 1995). Therefore, there is only one ILEC per exchange. Any company that seeks to compete with the ILEC in providing basic local exchange services must obtain a certificate of authority (COA) or a service provider certificate of authority (SPCOA) certificate from the Commission, and is generally referred to as a competitive local exchange carrier (CLEC).... A total of 58 ILECs currently provide service to over 12 million basic business and residential access lines in Texas.").

**27.** Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2045–2053, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.351–.359, recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 863–874, as TEX. UTIL. CODE §§ 58.001–.267.

years.[28] In exchange, section 58.025(a) provided that the carrier could not, "under any circumstances, be subject to a complaint, hearing, or determination regarding the reasonableness of the company's: (1) rates; (2) overall revenues; (3) return on invested capital; or (4) net income."[29] Under section 58.025(b), this did not "prohibit a complaint, hearing, or determination on an electing company's implementation and enforcement of a competitive safeguard required by Chapter 60",[30] which was also added by the 1995 amendments.[31] But section 58.062 specifically provided:

> Notwithstanding any other provision of this title [that is, PURA], the commission may not reduce an electing company's rates for switched access services before the expiration of the cap on basic network services.[32]

As the Commission explained in a 1999 report, "[t]he expectation was that, by the time the rate freeze ended, the market would be sufficiently competitive that prices would be disciplined without regulation."[33] SWBT elected incentive regulation, as did GTE–Southwest.[34]

Also under the federal Telecommunications Act of 1996, a "baby Bell" that proved it had opened its own local exchange market to competition and met certain other requirements was allowed for the first time to enter the interLATA long-distance market.[35] In 1999, SWBT, to-

**28.** TEX. UTIL. CODE § 58.021; *see* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2046, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.352(a), recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 864.

**29.** TEX. UTIL. CODE § 58.025(a); *see* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2046, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.352(d), recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 864; *Cities of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 439–440 (Tex.2002).

**30.** TEX. UTIL. CODE § 58.025(b); *see* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2046, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.352(d), recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 864.

**31.** Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2056–2061, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.451–.463, recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 879–888 (current version at TEX. UTIL. CODE §§ 60.001–.163).

**32.** TEX. UTIL. CODE. § 58.062; *see* Act of May 16, 1995, 74th Leg., R.S., ch. 231, § 49, 1995 Tex. Gen. Laws 2017, 2046, formerly TEX. REV. CIV. STAT. ANN. art. 1446c–0, § 3.352(d), recodified by Act of May 8, 1997, 75th Leg., R.S., ch. 166, § 1, 1997 Tex. Gen. Laws 713, 879–888, repealed by Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 56, 1999 Tex. Gen. Laws 4210, 4241.

**33.** *See 1999 Scope of Competition Report, supra* note 10, at vii.

**34.** *See id.* at 83 (showing that two carriers—SWBT and GTE–Southwest—elected incentive regulation under PURA chapter 58, and five other carriers elected regulation under chapter 59); *2001 Switched Access Charges Report, supra* note 17, at 16 (stating that "[c]urrently three incumbent local telephone companies in Texas have elected into the plan of incentive regulation under Chapter 58 of PURA: Southwestern Bell Telephone (SWBT) and the Verizon companies (GTE Southwest or GTESW, and Continental Telephone or Contel)").

**35.** 47 U.S.C. §§ 271–272 (2001 & Supp.2005); *see 1999 Scope of Competition Report, supra* note 10, at 93 ("Since the divestiture of AT & T, neither of the two largest ILECs [incumbent local exchange carriers] (SWBT and GTE–SW) or their affiliates have been permitted to provide interLATA interexchange long-distance service, However, with the passage of the FTA, this situation is changing. GTE–

gether with a sister company, Southwestern Bell Communications Services, Inc. ("SBCS"), and their parent, SBC Communications, Inc. (collectively, "SBC"), applied for permission for SBCS to compete in interLATA markets in Texas. That same year, the Legislature extended the incentive regulation period for local exchange carriers under chapter 58 to September 1, 2005,[36] and apparently in anticipation of SBC's application being granted, amended chapter 58 by adding section 58.301, requiring an electing carrier with more than five million access lines in Texas—only SWBT fell within the requirement—to reduce switched access rates $0.01 per minute by September 1, 1999, and an additional $0.02 per minute by the earlier of July 1, 2000, or the date it began providing interLATA services in Texas.[37] SWBT complied with these reductions. At the same time, the Legislature removed switched access rates from the list of basic services[38] and repealed section 58.062,[39] which prohibited the Commission from reducing them,[40] but added a new section 58.302 (which we quote and examine in more detail in part II) restricting increases

and decreases in such rates.[41] The FCC approved SBC's application effective June 30, 2000,[42] and SBCS began offering interLATA long-distance service to SWBT's local exchange customers ten days later.[43]

Shortly thereafter, on September 22, 2000, AT & T Communications of Texas, Inc. ("AT & T Communications"), an AT & T affiliate that provides local exchange service and intraLATA and interLATA long-distance service in competition with SWBT and SBCS, complained to the Commission that SBCS was offering intrastate long-distance services to SWBT's customers below cost. AT & T Communications alleged that it and other intrastate long-distance carriers could not meet SBCS's prices because they had to pay SWBT's above-cost switched access rates (which, as already noted, are nearly $0.06 per minute, as opposed to $0.01 per minute for interstate calls[44]) for access to its extensive local exchange networks throughout Texas. Although SBCS was required to pay SWBT the same switched access rates as other carriers, SBCS could survive, AT & T

SW's affiliate GTE Long–Distance, Inc. (GTE–LD), like the affiliates of some smaller ILECs, is now providing interexchange services to retail customers. SWBT has petitioned the Federal Communications Commission (FCC) to permit it to offer such services."); Public Util. Comm'n of Texas, *Scope of Competition in Telecommunications Markets of Texas* at 4 (Jan.2001) [hereinafter *2001 Scope of Competition Report*] ("Section 271 of the FTA allows a Bell Operating Company (BOC) to enter the long distance market after the BOC *proves* that it has opened its local market to competition." (emphasis in original)).

**36.** Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 35, 1999 Tex. Gen. Laws 4210, 4227, amending TEX. UTIL. CODE § 58.021.

**37.** Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 45, 1999 Tex. Gen. Laws 4210, 4232, adding TEX. UTIL. CODE § 58.301.

**38.** Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 39, 1999 Tex. Gen. Laws 4210, 4228–4229, amending TEX. UTIL. CODE § 58.051.

**39.** Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 57(1), 1999 Tex. Gen. Laws 4210, 4241, repealing TEX. UTIL. CODE § 58.062.

**40.** Act of May 8, 1997, 75th Leg., R.S., ch. 155, § 1, 1997 Tex. Gen. Laws 713, 868.

**41.** Act of May 30, 1999, 76th Leg., R.S., ch. 1212, § 45, 1999 Tex. Gen. Laws 4210, 4232, adding TEX. UTIL. CODE § 58.302.

**42.** *In re Application by SBC Communications Inc.*, 15 F.C.C.R. 18354 (2000).

**43.** *See 2001 Scope of Competition Report, supra* note 35, at 9–10.

**44.** *See 2003 Scope of Competition Report, supra* note 21, at 67.

Communications alleged, because of cross-subsidization between SBCS and SWBT, sister companies. AT & T Communications contended that SBCS's "price squeeze"[45] on intrastate long-distance carriers was "anti-competitive, discriminatory, unreasonably preferential and prejudicial" under section 60.001(1) of PURA,[46] and would force it out of the market. AT & T Communications asserted that "the only way for the Commission to stop the abuses that have been introduced into the market and allow all Texas consumers to benefit from real competition from a variety of market participants is for the Commission to reduce to cost the rates for intrastate switched access service charged by SWBT today." AT & T Communications did not ask the Commission for any other specific relief but did request "any other remedy, under law or equity, to which AT & T shows itself to be justly entitled."

The Commission denied SWBT's and SBCS's motions to dismiss, concluding that AT & T Communications' complaint was within its jurisdiction and "stated a claim upon which the Commission may grant some form of relief as provided by PURA", without specifying what that relief might be. The Commission then referred the complaint to the State Office of Administrative Hearings ("SOAH") to hear and determine whether SWBT and SBCS had violated PURA, reserving for later the issue of an appropriate remedy. Specifically, the Commission identified the following issues for consideration:[47]

- "Are SWBT and [SBCS] engaging in intra-corporate cross-subsidization, which facilitates a price squeeze for interLATA and/or intraLATA telecommunications services that is unreasonably preferential, prejudicial, and/or discriminatory as applied?"

- "Has either SWBT or [SBCS] priced intrastate long distance services in an anti-competitive manner?"

 - "What are the costs incurred by [SBCS] to provide intrastate long distance service?"

 - "What is the long-run incremental cost to SWBT to provide intrastate switched access service?"

- "Has either SWBT or [SBCS] priced intrastate long distance services in a

---

**45.** *See Town of Concord v. Boston Edison Co.,* 915 F.2d 17, 18 (1st Cir.1990) ("To understand the nature of a price squeeze the reader must keep three basic facts in mind. First, a firm can engage in a price squeeze only if it operates at two levels of an industry, and only if its competitors at one level are also its customers.... Second, a price squeeze occurs when the integrated firm's price at the first level is too high, or its price at the second level is too low, for the independent to cover its costs and stay in business.... Third, Judge Learned Hand, in *United States v. Aluminum Co., supra,* wrote that a price squeeze violates Sherman Act § 2, 15 U.S.C. § 2(a), when (1) the firm conducting the squeeze has monopoly power at the first industry level, (2) its price at this level is 'higher than a "fair price,"' and (3) its price at the second level is so low that its competitors cannot match the price and still make a 'living profit.' *See id.* at 437–38.").

**46.** TEX. UTIL. CODE § 60.001(1) ("To the extent necessary to ensure that competition in telecommunications is fair to each participant and to accelerate the improvement of telecommunications in this state, the commission shall ensure that the rates and rules of an incumbent local exchange company: (1) are not unreasonably preferential, prejudicial, or discriminatory; and (2) are applied equitably and consistently.").

**47.** *See* TEX. GOV'T CODE § 2003.049(e) ("At the time the office receives jurisdiction of a proceeding, the commission shall provide to the administrative law judge a list of issues or areas that must be addressed. In addition, the commission may identify and provide to the administrative law judge at any time additional issues or areas that must be addressed.").

manner that has resulted in the subsidization of competitive services with revenue from monopoly services in violation of P.U.C. SUBST. R. 26.226?"

- "Are SWBT and [SBCS] engaged in conduct regarding the pricing of intra-LATA and interLATA telecommunication services or switched access rates that is in violation of the imputation requirements of PURA §§ 60.061, 60.063, and P.U.C. SUBST. R. 26.274?"

(AT & T Communications also asserted a claim for predatory pricing under PURA § 52.107, but later withdrew it, and that claim is not at issue in this case.)

The Commission also established the following "standards of proof":

- "[A]nti-trust principles and law are not relevant in establishing a cross-subsidization claim ... [but] shall be utilized to establish a price squeeze claim."

- "[C]ross-subsidization ... occurs when the company operates in two markets, one that is regulated due to its market power and one that is not, ... and uses the proceeds from the sales of services in the regulated market to subsidize below-cost prices for services in the competitive market."

- "[A] price squeeze occurs when a company possessing monopoly power sells upstream market services to an affiliated company and a direct competitor, and the affiliated company then utilizes the upstream market services to sell downstream market services to end-users at a rate that does not allow it to fully recover the costs of provisioning the downstream market services, and therefore, the competitor

cannot profitably compete with the affiliated company in the downstream market."

Within days of the Commission's referral of the case for hearing, SWBT sued the PUC to enjoin any further proceedings, asserting that they were outside the Commission's authority. SBCS intervened on SWBT's side, and AT & T Communications intervened on the PUC's side. The trial court denied SWBT and SBCS's request for a temporary injunction, but on interlocutory appeal, the court of appeals reversed.[48] The trial court then granted summary judgment for SWBT and SBCS. With respect to SWBT, the court issued a declaratory judgment holding that:

1. The Commission is acting beyond its statutory authority in conducting a hearing related to the validity of SWBT's current switched-access rates in PUC Docket No. 23063 and SOAH Docket No. 473–01–1558.

2. Because SWBT is charging the switched-access rates set by the Legislature in PURA §§ 58.301 and 58.302, the Commission has no statutory authority or jurisdiction to review for any regulatory purpose the validity or amount of SWBT's current switched-access rates.

3. Because SWBT is an electing company under Chapter 58 of PURA, a hearing on AT & T's Complaint in PUC Docket No. 23063, and SOAH Docket 473–01–1558, is an unlawful inquiry regarding the reasonableness of SWBT's rates; overall revenues; return on invested capital; or net income that is prohibited under any circumstances by PURA § 58.025(a).

4. Neither PURA § 58.025(b) nor any other provision of PURA allows the Commission to adjust SWBT's current

**48.** *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 72 S.W.3d 23 (Tex.App.—Austin 2001, pet. dism'd w.o.j.).

switched-access rates set by the Legislature through the implementation and enforcement of competitive safeguards under Chapter 60 of PURA, or by determining that the legislatively authorized switched-access rates violate PURA § 60.001 in any respect, or by any other means.

The court enjoined the Commission, AT & T Communications, and others from pursuing—

any matter related to the validity of SWBT's current switched-access rates, including allegations of intra-corporate cross-subsidization or a price squeeze or other allegations related to the implementation and enforcement of competitive safeguards under Chapter 60 of PURA.

"[S]pecifically," the court added, none of the issues the Commission had identified for SOAH could be heard or determined. However, the court continued, the Commission could consider—

- "allegations of anti-competitive conduct and/or the implementation and enforcement of competitive safeguards under Chapter 60 of PURA involving matters other than the reasonableness of SWBT's rates, overall revenues, return on invested capital, or net income, or the validity for any regulatory purpose of legislatively authorized switched-access rates", and

- "whether SWBT has satisfied the imputation requirements set forth in PURA §§ 60.061, 60.063 and Rule 26.274 in its pricing of intraLATA long distance services".

With respect to SBCS, the court issued a declaratory judgment holding that the Commission had no authority to hear or investigate AT & T Communications' complaint against SBCS under PURA §§ 52.002(b), 52.102(a), 52.107, 52.108, 60.061, or 60.063, or under Commission Substantive Rules 26.226 and 26.274.

The Commission and AT & T Communications appealed. The court of appeals affirmed.[49] We granted the Commission's and AT & T Communications' petitions for review.[50]

## II

■ AT & T Communications argues that the Commission is authorized to reduce an electing incumbent local exchange carrier's switched access rates to ensure fair competition. Although section 58.025(a) provides that "[a]n electing company is not, under any circumstances, subject to a complaint, hearing, or determination regarding the reasonableness of the company's ... rates",[51] section 58.025(b) adds that "[t]his section does not prohibit a complaint, hearing, or determination on an electing company's implementation and enforcement of a competitive safeguard required by Chapter 60."[52] Section 60.001 states:

To the extent necessary to ensure that competition in telecommunications is fair to each participant and to accelerate the improvement of telecommunications in this state, the commission shall ensure that the rates and rules of an incumbent local exchange company:

(1) are not unreasonably preferential, prejudicial, or discriminatory; and

(2) are applied equitably and con-

---

49. 112 S.W.3d 221 (Tex.App.—Austin 2003).

50. 47 Tex. Sup.Ct. J. 599 (May 28, 2004).

51. TEX. UTIL. CODE § 58.025(a)(1).

52. *Id.* § 58.025(b).

sistently.[53]

Section 60.003 authorizes the Commission to resolve disputes under this policy,[54] and section 60.002(b) states that "[s]ection 58.025 does not prevent the commission from enforcing this chapter."[55] AT & T Communications argues that subsections 58.025(a), 58.025(b), and 60.002(b) are properly harmonized by prohibiting any inquiry into the *reasonableness* of an electing carrier's rates, in the sense in which rates are determined through traditional rate-making proceedings, while permitting—indeed, requiring—inquiry into the anticompetitiveness of such rates, and if appropriate, reducing them. In AT & T Communications' view, an electing carrier is exempt from rate reduction through traditional regulatory proceedings but not through proceedings to protect competition. The Commission agrees with this argument.

 The argument could not have been made in 1995, when chapters 58 and 60 were first enacted, because at that time chapter 58 included section 58.062, which, as we have already noted, prohibited the Commission from reducing an electing carrier's switched access rates before the expiration of the four-year cap on basic

network service, *"[n]otwithstanding any other provision "* of PURA (emphasis added).[56] But section 58.062 was repealed in 1999, at the same time that the cap on basic network services was extended six years, switched access rates were removed from basic services, and sections 58.301 and 58.302 regarding those rates were added.[57] Section 58.301 required SWBT—the only carrier to which it applied—to reduce switched access rates $0.01 by September 1, 1999, and an additional $0.02 by the earlier of July 1, 2000, or the date that an SWBT affiliate began providing interLATA service as permitted by the federal Telecommunications Act of 1996.[58] SWBT argues that section 58.301 actually set its switched access rates, so that they could not be changed, but we agree with AT & T Communications that by requiring specific reductions, the statute only caps the rates and does not preclude further reductions. SWBT points to a statement made in legislative committee hearings by Senator Sibley, the author of the 1999 amendments, that the effect of sections 58.301 and 58.302 was to set switched access rates, and "the PUC has no, they have no authority to go below that or go above it or do whatever they want to do. We are setting it."[59] But the statement of a sin-

---

53. *Id.* § 60.001.

54. *Id.* § 60.003(a) ("The commission may: (1) establish procedures with respect to a policy stated in this subchapter ...; and (2) resolve a dispute that arises under a policy described by Subdivision (1).").

55. *Id.* § 60.002(b).

56. *Supra* note 32 and accompanying text.

57. *Supra* notes 36–41 and accompanying text.

58. TEX, UTIL. CODE § 58.301 ("An electing company with greater than five million access lines in this state shall reduce its switched access rates on a combined originating and terminating basis as follows: (1) the electing

company shall reduce switched access rates on a combined originating and terminating basis in effect on September 1, 1999, by one cent a minute; and (2) the electing company shall reduce switched access rates on a combined originating and terminating basis by an additional two cents a minute on the earlier of: (A) July 1, 2000; or (B) the date the electing company, or its affiliate formed in compliance with 47 U.S.C. Section 272, as amended, actually begins providing interLATA services in this state in accordance with the authorization required by 47 U.S.C. Section 271, as amended.").

59. *Hearing on Tex. S.B. 500 Before the Senate Econ. Dev. Comm., Subcomm. on Tech. and Bus. Growth*, 76th Leg., R.S. (April 8, 1999) (statement of Sen. Sibley) (audio tape avail-

gle legislator, even the author and sponsor of the legislation, does not determine legislative intent.[60]

 Section 58.302, which applies to all electing carriers, presents greater difficulties for AT & T Communications' argument. Section 58.302 states:

(a) An electing company may not increase the per minute rates for switched access services on a combined originating and terminating basis above the lesser of:

(1) the rates for switched access services charged by that electing company on September 1, 1999, as may be further reduced on implementation of the universal service fund under Chapter 56; or

(2) the applicable rate described by Section 58.301 as may be further reduced on implementation of the universal service fund under Chapter 56.

(b) Notwithstanding Subchapter F, Chapter 60, but subject to Section 60.001, an electing company may, on its own initiative, decrease a rate charged for switched access service to any amount above the long run incremental cost of the service.[61]

Subsection (a), by prohibiting any increase *above* a certain level, necessarily implies that a carrier can raise rates *to* that level. Likewise, subsection (b), by permitting a carrier to reduce rates *to* long-run incremental cost, necessarily implies that a carrier cannot reduce rates *below* that level. Although switched access rate reductions are made subject to section 60.001, rate increases are not. We cannot treat this difference as insignificant. In 1995, the Legislature was careful to except the Commission's authority to ensure fair competition under chapter 60 from the prohibition in section 58.025(a) against any regulation of the reasonableness of an electing carrier's rates, and then by section 58.062 to except from the exception any reduction of switched access rates whatever. We do not think it plausible that the Legislature, in repealing section 58.062 and adopting sections 58.301 and 58.302 instead, all relating to switched access rates, was so careless in drafting section 58.302(a) that it omitted by mistake the reference to section 60.001 that it included a few words later in section 58.302(b). Rather, we must treat the omission as intentional.

While we are mindful that the Commission is entitled to some deference in construing statutes affecting its jurisdiction,[62]

---

able from Texas State Library and Archives Comm'n).

**60.** *See General Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 923 (Tex.1993) ("[T]he intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute. It is at most persuasive authority as might be given the comments of any learned scholar of the subject."); *C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 328 (Tex.1994) (Hecht, J., concurring and dissenting) ("While the perspectives of individual legislators on the meaning of statutes may be instructive, they do not govern the construction of the statute. We are obliged to effectuate the intent of the Legislature and not merely that of some of its members. It is not unusual for

intentions concerning particular legislation to vary among its supporters. We must assume that the Legislature has done its very best to express its intent in the words of the statute itself. Even when those words leave us in such doubt as to the Legislature's purpose that we must look beyond the provision for assistance, it is ordinarily inappropriate to consider the views of individual legislators.").

**61.** TEX. UTIL. CODE § 58.302.

**62.** *Cities of Austin v. Southwestern Bell Tel. Co.,* 92 S.W.3d 434, 441–442 (Tex.2002) ("[W]e give weight to how the PUC interprets its own powers, but only if that interpretation is reasonable and not inconsistent with the statute.").

the Commission has advanced no reasonable alternative construction of section 58.302. By specifying the instances when an electing carrier's rates may be reduced under section 60.001 to ensure fair competition, the Legislature has implied that no other reductions are permitted. Thus, we conclude that section 58.302(a), by not referencing chapter 60 or section 60.001 as sections 58.025(b) and 58.302(b) do, entitles an electing carrier to increase its switched access rates to the specified level without regard to a determination by the Commission of the effect on competition. Since SWBT's switched access rates are at that level, the Commission has no authority under chapter 60 to reduce them.

## III

■ Apart from reducing switched access rates or determining their reasonableness, which we have concluded the Commission has no authority to do, the Commission is not only authorized but obligated by chapters 58 and 60 "to ensure that competition in telecommunications is fair to each participant and to accelerate the improvement of telecommunications in this state".[63] The Commission contends that it has measures available to it to discharge this responsibility without reducing switched access rates. At oral argument, counsel for the Commission stated that it could order compliance with statutes, impose civil penalties, and prohibit cross-subsidization. The Commission has not offered a more definitive explanation of what measures it could take if SWBT

were found to have engaged in anticompetitive conduct, having reserved issues regarding remedies from the reference of AT & T Communications' complaint to SOAH for hearing. We need not determine what remedies may be available to the Commission in such circumstances. We have held only that the Commission may not reduce switched access rates or inquire into their reasonableness. AT & T Communications argues that the trial court's declaratory judgment and permanent injunction are overly broad and go beyond this holding to deprive the Commission of part of its statutory authority to ensure fair competition. We agree.

The trial court's judgment, the principal provisions of which we have quoted above, is not entirely clear. It holds that "a hearing on AT & T's Complaint ... is an unlawful inquiry regarding the reasonableness of SWBT's rates", but then allows further proceedings on the complaint "involving matters other than the reasonableness of SWBT's rates." It also holds that the Commission lacks authority not only to reduce switched access rates but to consider their "validity", as distinguished from their "reasonableness", apparently following the court of appeals' choice of words in its opinion on the interlocutory appeal instead of the statutory language in section 58.025(a).[64] The court of appeals reasoned that the two words are equivalent in this context because the Legislature has set switched access rates and therefore established their validity.[65] But we have con-

63. TEX. UTIL. CODE § 60.001.

64. 112 S.W.3d 221, 233 (Tex.App.—Austin 2003) ("[I]n reviewing the temporary injunction, this Court cautioned that an injunction should be drawn 'with such specificity so as to remedy only the particular harm complained of,' stating: 'By this, we mean the contested case may proceed in the PUC for purposes unrelated to the *validity* of SWBT's

current switched-access charges.' *Southwestern Bell*, 72 S.W.3d at 34–35 (emphasis added). The district court was obviously tracking the language employed in this Court's opinion. We used the term 'validity' because it is appropriate under these facts.").

65. *Id.* ("When the legislature set the switched-access rates and SWBT became an electing company, the rates authorized under the leg-

cluded that the Legislature has only capped switched access rates, not set them. The Commission's lack of authority to reduce switched access rates does not preclude it from determining that they have an anticompetitive effect and attempting to fashion an appropriate remedy within its power. By prohibiting the Commission from inquiring into the "validity" of SWBT'S switched access rates, the judgment could be read to preclude that determination.

The judgment states that the Commission—

- *cannot* consider "allegations of intracorporate cross-subsidization or a price squeeze or other allegations related to the implementation and enforcement of competitive safeguards under Chapter 60 of PURA";
- *can* consider "allegations of anti-competitive conduct and/or the implementation and enforcement of competitive safeguards under Chapter 60 of PURA involving matters other than the reasonableness of SWBT's rates"; and
- *cannot* consider any issue identified by the Commission in its reference to SOAH, other than SWBT's compliance with imputation requirements.

Thus, the judgment appears to prohibit consideration of all of AT & T Communications' allegations of anticompetitive conduct, excluding only allegations it has not made. SWBT explains that the exclusion was intended to narrow the injunction, but it hardly serves the purpose, since it allows the Commission to do only those things no one has asked it to do.

As we read the judgment, it appears to contain three bases for prohibiting the Commission from considering AT & T Communications' allegations of anticompetitive conduct. First, the judgment appears to be based in part on the premise that allegations of cross-subsidization and a price squeeze necessitate a determination of the reasonableness of SWBT's switched access rates prohibited by section 58.025(a). But SWBT's rates may be reasonable in the sense involved in traditional rate-making—that is, reasonable in terms of cost, revenue, profit, return on investment, and other policy considerations—and maybe even reasonable in an historical sense, given the evolution of the telecommunications market, yet still impede competition. SWBT has not established that AT & T Communications' allegations can be determined only by violating section 58.025(a). Second, the judgment states that the Commission cannot consider AT & T Communications' allegations of anticompetitive conduct because "the only way the Commission can remedy this alleged problem is by reduction of SWBT's switched-access rates to cost." But the Commission contends that rate reduction is not its only remedy, and SWBT has not established that it is. Third, the judgment appears to adopt SWBT's argument that charging switched access rates set by the Legislature cannot be anticompetitive. But the Legislature only capped rates; it did not set them. Even if it had set them, the rates might yet be determined to have an anticompetitive effect that could be remedied without reduction.

Given the Commission's responsibility under chapter 60, the declaratory and injunctive relief granted by the trial court should have followed more closely the restrictions in chapter 58. SWBT is entitled to the following relief:

> The Commission is declared to be without authority (i) to reduce SWBT's switched access rates, (ii) to determine

islative scheme are not only reasonable, but also valid.").

their reasonableness or any other matters proscribed by section 58.025(a), or (iii) to allow proceedings for either purpose. The Commission is permanently enjoined from acting contrary to this declaration. The Commission may consider whether SWBT's switched access rates result in unfair competition under chapter 60 and may take action authorized by PURA.

## IV

■ Finally, AT & T Communications argues that its complaint against SBCS— that SBCS is engaging with its affiliate, SWBT, in a price squeeze and is offering long-distance service to SWBT's customers on terms more favorable than those offered to non-customers—is within the Commission's jurisdiction under PURA section 52.108(3).[66] The Commission agrees. SBCS counters that the Commission's only jurisdiction over such a complaint against an interexchange long-distance carrier, which SBCS is, is under PURA section 52.107. As we have noted, AT & T Communications alleged a complaint under section 52.107 at one time but then withdrew it.

Section 52.107, entitled "Predatory Pricing", states in pertinent part:

(a) The commission may enter an order necessary to protect the public interest if the commission finds by a preponderance of the evidence after notice and hearing that an interexchange telecommunications utility has:

(1) engaged in predatory pricing; or

(2) attempted to engage in predatory pricing.

(b) A hearing held by the commission under Subsection (a) must be based on a complaint from another interexchange telecommunications utility.

\* \* \* \* \* \*

(d) This section applies only to an interexchange telecommunications utility.[67]

As all parties acknowledge, this section would give the Commission jurisdiction over AT & T Communications' claim against SBCS.

Section 52.108(3), entitled "Other Prohibited Practices", states:

The commission may enter any order necessary to protect the public interest if the commission finds after notice and hearing that a telecommunications utility has:

\* \* \* \* \* \*

(3) engaged in a pattern of preferential or discriminatory activities prohibited by Section 53.003, 55.005, or 55.006 .... [68]

Section 53.003 states in pertinent part:

(b) A rate may not be unreasonably preferential, prejudicial, or discriminatory but must be sufficient, equitable, and consistent in application to each class of consumer.

(c) A public utility may not:

(1) grant an unreasonable preference or advantage concerning rates to a person in a classification;

(2) subject a person in a classification to an unreasonable prejudice or disadvantage concerning rates; or

(3) establish or maintain an unreasonable difference concerning rates

---

66. TEX. UTIL. CODE § 52.108(3).

67. *Id.* § 52.107(a)-(b), (d).

68. *Id.* § 52.108.

between localities or between classes of service.[69]

Section 55.005 states:

> In providing a service to persons in a classification, a public utility may not:
>
> (1) grant an unreasonable preference or advantage to a person in the classification; or
>
> (2) subject a person in the classification to an unreasonable prejudice or disadvantage.[70]

Section 55.006 states:

> A public utility may not:
>
> (1) discriminate against a person who sells or leases equipment or performs services in competition with the public utility; or
>
> (2) engage in a practice that tends to restrict or impair that competition.[71]

The trial court granted summary judgment for SBCS, holding that the Commission lacked jurisdiction over AT & T Communications' complaint because it "inquires into competition in the provisioning of long distance services and section 52.107 is the sole statutory authority that the Commission has to investigate allegations of impairment of competition by an interexchange carrier in the long distance industry".[72] The court of appeals agreed and added:

> Section 52.108(3), by its plain language, prohibits preferential and discriminatory activities that have to do with rate and service classifications for *consumers*. What section 52.108 does is protect customers of an interexchange telecommunications utility from being subjected to unreasonable discrimination

or preferences concerning the establishment of different rates for different classes of customers. AT & T does not allege SBCS's prices are prejudicial or discriminatory against customers and even recognizes that SBCS's prices benefit customers. While the Commission claims that AT & T's complaint is not about competition, the sole allegation it points to in support of this is AT & T's assertion in its complaint that SBCS has limited its offering of interLATA long-distance service to SWBT customers. However, AT & T acknowledges in its brief to this Court that this is no longer correct. What AT & T asserts is that SBCS's prices discriminate against and are preferential *as to AT & T,* not as to customers, because those prices impact AT & T's ability to compete. This is not the type of discrimination or preferential treatment addressed by sections 53.003, 55.005, or 55.006.[73]

Although the court of appeals was correct that AT & T Communications no longer complains that SBCS has limited its long-distance service offers to SWBT customers, AT & T Communications persists in its complaint that SBCS offers SWBT customers preferential terms as compared with non-customers. This complaint is not concerned solely with discrimination against AT & T Communications, as the court of appeals concluded, or with "competition in the provisioning of long distance services", as the trial court concluded. While AT & T Communications' allegations that SBCS offers preferential terms to SWBT customers seems to be a minor part of its complaint, we cannot say that they are beyond the jurisdiction of the

---

69. *Id.* § 53.003(b)-(c).

70. *Id.* § 55.005.

71. *Id.* § 55.006.

72. 112 S.W.3d 221, 231 (Tex.App.—Austin 2003).

73. *Id.* at 232.

534

Commission to consider under section 52.108(3).

That jurisdiction does not, however, extend to AT & T Communications' allegations against SBCS that it has engaged with SWBT in cross-subsidization and a price squeeze. AT & T Communications argues that the allegations are squarely within section 55.006, and we agree that the language of that provision is broad enough to encompass them. But the essence of the allegations is that SWBT and SBCS have engaged in predatory pricing, which is the specific subject of section 52.107. SBCS argues that to also allow allegations of predatory pricing to be considered as violations of section 52.108(3) would nullify the procedural restrictions imposed by section 52.107 that complaint must be made by an interexchange carrier and proof must be by a preponderance of the evidence. We agree. Indeed, the title of section 52.108, "Other Prohibited Practices", following after section 52.107 entitled "Predatory Pricing", indicates that the prohibited practices covered by section 52.108 are *other* than predatory pricing covered by section 52.107. The fact that AT & T Communications is an interexchange carrier which could complain under section 52.107 does not allow it to bring the same complaint under section 52.108.

Accordingly, we conclude that the Commission's jurisdiction over SBCS extends only to AT & T Communications' allegations that SBCS has engaged in preferential activities and not allegations that SBCS has engaged with SWBT in cross-subsidization or a price squeeze. Of course, as we have already held, the Commission may consider under chapter 60 AT & T Communications' allegations that SWBT has engaged in unfair competition.

\* \* \* \* \* \*

The judgment of the court of appeals is reversed, the judgment of the trial court is vacated, and the case is remanded to the trial court for rendition of judgment in accordance with this opinion.